UNCLASSIFIED//FOR PUBLIC RELEASE.

FILED WITH THE
COURT SECURITY OFFICER
CSO: _R Krause_
DATE: _10/29/09_

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KARIM BOSTAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-883 |
| ) | |
| BARACK H. OBAMA, ) | |
| President of the United States, <u>et al.</u>, ) | |
| ) | |
| Respondents. ) | |

## MEMORANDUM OPINION

On August 6, 2009, the Court heard oral argument on the merits of the evidentiary objections filed by Karim Bostan (ISN 975) with respect to the sources of evidence cited by the government in support of its proposed findings of fact regarding that petitioner.[1]  After considering the parties' written submissions and oral arguments,[2] the Court concluded that it had to defer its consideration of the petitioner's objections to the introduction into evidence of certain intelligence and interrogation reports cited by the government, overrule the petitioner's objections to certain statements made by the government in its proposed findings of fact and

---

[1]  In addition to the President, who is named as a respondent in his official capacity, the petitioner names various government officials as additional respondents in his habeas corpus petition.  A motion is currently pending before Judge Thomas F. Hogan of this Court to clarify whether the Secretary of Defense is the only proper respondent in this case.  Because Judge Hogan has not yet resolved that motion, and for ease of reference, the Court refers to the respondents collectively as the "government" for purposes of this memorandum opinion.

[2]  In addition to the oral representations made by the parties at the hearing held on August 6, the Court considered the following documents in reaching its oral rulings issued that same date and in reaching its written decision today: (1) the Factual Return filed by the government (the "Gov't's Return"), (2) Petitioner Kari[m] Bostan's Traverse (the "Pet'r's Traverse"), (3) the Respondents' Proposed Factual Findings and Sources of Evidence (the "Gov't's Facts"), (4) the Respondents' Motion and Memorandum to Admit Hearsay Evidence (the "Gov't's Mem."), (5) Petitioner Kari[m] Bostan's Opposition to Respondents' Proposed Factual Findings and Sources of Evidence (the "Pet'r's Mem."), and (6) the Respondents' Reply to Bostan's Evidentiary Objections (the "Gov't's Reply").

UNCLASSIFIED//FOR PUBLIC RELEASE.

conclusions of law, and sustain the petitioner's objection to the introduction into evidence of press releases and news articles proffered by the government.  The Court issued oral rulings to that effect at the close of the hearing.  Having reflected on those rulings over the preceding weeks, and in light of the memorandum opinion subsequently issued by the Court in this case styled Bostan v. Obama, Civil Action Nos. 05-883 (RBW), 05-2386 (RBW), 2009 WL 2516296, ___ F. Supp. 2d ___ (D.D.C. Aug. 19, 2009) (Walton, J.), and the separate memorandum opinion written in another case involving a detainee at Guantánamo Bay styled Al Bihani v. Obama, Civil Acton No. 05-2386 (RBW), slip op. (D.D.C. Sept. 8, 2009) (Walton, J.), the Court writes separately to supplement and, in some instances, amend its oral rulings.

## I. Background

The following facts are alleged in the government's proposed findings of fact and sources of evidence.  The petitioner, the nephew of "a well-known mujahideen commander under mujahideen leader Mawlawy Khallis," Gov't's Facts ¶ 15,[3] "lived in the Thbai refugee camp near Miram Shah, Pakistan[,] . . . for approximately 13 years," id. ¶ 13, during which time he "guard[ed] a mujahideen command post . . . for 15 to 20 days every five months over a four-to-five-year period," id. ¶ 14.  "After the [Soviet-Afghan] war, [the petitioner allegedly] returned to Khowst from Pakistan and operated a flower shop and a pots and pans store in the Khowst [b]azaar."  Id. ¶ 17.  As alleged by the government, "[his] business partner was a man named Obaidullah," id., another detainee at Guantánamo Bay whom the petitioner "met . . . at a Jamaat al-Tablighi [('Jamaat')] religious center [sometime] around 2000," id. ¶ 18.

According to the government, "Jamaat is closely aligned with several Pakistani extremist groups and the al-Qaida network," and "Jamaat members have used its peaceful religious

---

[3] The government alleges that Khallis "was a leader of Hezb-e-Islami," a "terrorist group . . . suspected of targeting the [United States] ambassador to Afghanistan in 2003."  Gov't's Facts ¶ 16.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

mission as a cover to recruit religious extremists to terrorist organizations," id. ¶ 25, and to "help[] recruit foreign fighters for the Taliban and al-Qaida," id. ¶ 26. Indeed, "[i]n late 2002, Afghanistan's foreign minister banned Jamaat from Afghanistan because Jamaat was strengthening the al-Qaida network under the guise of preaching." Id. ¶ 27. Nevertheless, "Jamaat has offices all over the world and funds its members' travel to preach about Islam worldwide." Id. ¶ 23.

With respect to the conflict in Afghanistan in particular, Jamaat allegedly "arranged transportation for" an al-Qaida fighter named Musab Omar Ali al-Madoonee "and other fleeing Arab fighters at a collection point in the Paktia [p]rovince, adjacent to Khowst." Id. ¶ 33. "Jamaat members also [allegedly] arranged for transportation to Pakistan at a safehouse near Zormat, Afghanistan, and then provided . . . transportation from Bannu, Pakistan[,] to Lahore." Id. "Likewise, Jamaat members [allegedly] transported . . . Taliban fighters from Zormat to Bannu University in Pakistan," where they "instructed each fleeing fighter to shave his head and leave his clothes behind" and "gave the fighters traditional Pakistani clothing to wear." Id. ¶ 34.

The petitioner allegedly joined Jamaat "[i]n or around 1996." Id. ¶ 19. Through this organization, the petitioner was allegedly introduced not only to Obaidullah, but also to another future Guantánamo Bay detainee, Abdullah Wazir, who would, according to the government, become a "member of [the petitioner's] bomb cell." Id. ¶ 22. Further, in his capacity as a member of Jamaat, the petitioner allegedly "helped Abdul Mohsin al-Zam[e]l," yet another future detainee at Guantánamo Bay, "escape from Afghanistan to Pakistan after Kabul fell to coalition forces." Id. ¶ 28. Specifically, al-Zamel, who "had been wounded in [a] coalition air assault," id. ¶ 29, allegedly "stayed at [the petitioner's] house in Khowst for a week before

UNCLASSIFIED//FOR PUBLIC RELEASE.

[the petitioner] helped make arrangements to take al-Zam[e]l and another Arab fighter to a house at the Pakistan border," id. ¶ 30.

The government also alleges that the petitioner led an al-Qaida bomb cell in eastern Afghanistan.



Allegedly, "Obaidullah ultimately admitted at the scene that he was keeping the mines for an individual named Karim and that Karim gave him the notebook." Id. ¶ 38. Further, "[d]uring interrogation at ▮▮▮▮▮ Airfield in Afghanistan, Obaidullah [allegedly] admitted his involvement with [the petitioner]." Id. ¶ 41.

In addition to Obaidallah's statements,

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

And, "[i]n an earlier reported incident, Obaidullah and [']Karim[' allegedly] had been seen taking some individuals to the hospital after the individuals suffered injuries setting up some mines." Id. ¶ 40.

That same day, "during interrogation by the [United States] military at Bagram, Obaidullah [allegedly] provided the location of [the petitioner's] home, despite previously professing not to know where [the petitioner] lived." Id. ¶ 44. "The next day, he also [allegedly] provided information about a planned attack on Kabul and the location of a landmine cache." Id. ¶ 44.1.

In addition, Obaidullah allegedly stated that "[the petitioner] recruited [him] for an al-Qaida bomb cell," that Obaidullah and the petitioner "met four times and discussed terrorist attacks," and that, "[a]t their first meeting, [the petitioner] talked about killing Americans and a planned attack on Kabul." Id. ¶ 44.4. Obaidullah allegedly stated that "[the petitioner] had asked [him] to drive a truck full of wood, lumber[,] and a bomb to Kabul and to place it close to [United States] forces." Id. ¶ 45. As alleged by the government, Obaidullah further stated that, "[t]wo days after the first meeting [with the petitioner], . . . [the petitioner] told him to prepare a

UNCLASSIFIED//FOR PUBLIC RELEASE.

landmine cache," id. ¶ 46, and "delivered the landmines to [his] house" that same day, id. ¶ 46.1. "At their last meeting, about ten to twelve days after [the petitioner] delivered the landmines, [he] gave instructions to Obaidullah on how to set up a remote-detonated landmine attack." Id. ¶ 46.2.

"During interrogations in Afghanistan, Obaidullah also [allegedly] informed the military of a different cache of land mines that he and his uncle buried for [the petitioner] in the Mulani village." Id. ¶ 47. "Obaidullah [allegedly] provided the location of the compound where they were hidden, the precise location within the compound where they were hidden, and the name of the compound's owner." Id. ¶ 47.3. Further, Obaidullah allegedly "admitted that [the petitioner] would probably remove the mines in the near future." Id.

"After arriving at Guant[á]namo Bay,          [allegedly] implicated [the petitioner] in three separate interviews." Id. ¶ 48. Specifically,          allegedly stated "[i]n October and November of 2002 . . . that [the petitioner] requested that he store and plant . . . mines, and that          did so for money." Id. ¶ 48.1. "In March of 2003,          [allegedly] repeated his account about the mines," stating that "[the petitioner] had him store the landmines in return for money that          owed [the petitioner] for mismanaging their business." Id. ¶ 48.3. Moreover, "[a]ccording to          , three days before [his] arrest, [the petitioner] [allegedly] drew some schematics on how to detonate the mines in [his] notebook, which          placed under his mattress." Id. ¶ 48.3. Allegedly,          stated that [the petitioner] told him that the purpose of the mines was to kill people [the petitioner] disliked." Id. ¶ 48.4.

In addition to statements allegedly made to the government, Obaidullah allegedly made numerous statements to al-Zamel inculpating the petitioner. He allegedly told al-Zamel "that

UNCLASSIFIED//FOR PUBLIC RELEASE.

[he], [the petitioner], Omar Khadr, and others set up an ambush site in Khowst targeting an American convoy," id. ¶ 52.1, and "that the bomb cell operated under the direction of senior al-Qaida operative Abu al-Layth al-Libi," id. ¶ 52.4, who was allegedly "involved in IED attacks in eastern Afghanistan, including Khowst," id. ¶ 53.  More recently, Obaidullah allegedly "told interrogators at Guant[á]namo [Bay] that [the petitioner] had threatened him," id. ¶ 51.1, and "that he feared for his family in Afghanistan," id. ¶ 51.3.  Obaidullah also allegedly told Wazir "that he feared [the petitioner] would kill him." Id. ¶ 51.4.

The petitioner and ▮▮▮▮ were allegedly detained at a checkpoint in Pakistan by Pakistani soldiers on August 13, 2002. Id. ¶ 54. "The soldiers detained [the petitioner] and ▮▮▮▮ after [allegedly] witnessing ▮▮▮▮ pass a satellite phone to [the petitioner] as the soldiers prepared to question ▮▮▮▮' Id. ¶ 55.2. When he was apprehended, '▮▮▮▮ was [allegedly] carrying $2,700 in [United States] dollars, 3,600 Pakistani rupees, and 70,000 Afghan rupees." Id. ¶ 55.1. According to the government, "[t]he bomb notebook recovered from Obaidullah contained an entry about receiving '300' from 'Abdullah Noor'" followed by receipts of "'500' and '2700.'" Id. ¶ 55.1.1.  "Abdullah Noor is Wazir's brother and [allegedly] is another Jamaat missionary in Khowst." Id. ¶ 55.1.2.

According to the government, "Wazir's and [the petitioner's] stories have been inconsistent about why they were traveling together in Pakistan and are not credible." Id. ¶ 55. For example, "[the petitioner allegedly] had originally told investigators that ▮▮▮▮ was taking the phone to Peshawar to get it fixed, but [then] later said that he learned the phone was broken from the guards when they tried to turn it on." Id. ¶ 55.2.2. "In some accounts, ▮▮▮▮ and [the petitioner] each claimed that they were traveling together only because they met by chance at a bus station in Miram Shah, Pakistan," id. ¶ 55.4, but "[i]n a different account, Wazir said that

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

they met at a bus stop in Khowst, not Miram Shah," id. ¶ 55.4.1, and on yet another occasion "Wazir [allegedly] said that he first saw [the petitioner] when [he] got on the bus in Pakistan, as opposed to at the bus stop," id. ¶ 55.4.2. And while ▮▮▮▮ allegedly stated that, "[b]efore traveling together, . . . [he and the petitioner] had not seen each other for five years," id. ¶ 55.4.3, "[the petitioner allegedly] said that he and ▮▮▮▮ had seen each other only 15 days before traveling together . . . and that they saw each other every other 15 days either passing on the street in Khowst or at the local mosque," id. ¶ 55.4.4.

On June 12, 2009, the undersigned member of the Court, with respect to those habeas corpus petitions filed by detainees at the Guantanamo Bay Naval Base that are now pending before this member of the Court, amended the case management order governing these proceedings to establish a format for determining the admissibility of the evidence relied upon by the government prior to any factfinding hearing on the merits of the petitions.[4] Specifically, the Court determined, over the government's objection, that it would consider questions of admissibility regarding the government's evidence prior to holding any merits hearings in the detainee cases before it because the government's evidence, if held to be inadmissible in part or in whole, might not suffice to establish even a prima facie case for military detention under the standard set forth by this member of the Court in Gherebi v. Obama, 609 F. Supp. 2d 43 (D.D.C. 2009) (Walton, J.). The Court therefore established a framework by which the government would identify which sources of evidence it intended to rely upon at any evidentiary hearing on the merits of the petitioner's detention, the individual petitioners would file their objections to any evidence cited, and the Court would resolve such objections before determining whether the

---

[4] The Court initially ordered this amendment on June 4, 2009, but reconsidered and eventually vacated that order upon request from the government.

UNCLASSIFIED//FOR PUBLIC RELEASE.

government's case was strong enough to require rebuttal evidence from the individual petitioners.

As directed by the Court, the government has filed a statement of proposed facts listing the sources of evidence relied upon in this case with respect to each factual assertion. The government has also submitted a lengthy memorandum of law in support of the admissibility of those sources into evidence. In that memorandum of law, it argues that, pursuant to Hamdi v. Rumsfeld, 542 U.S. 507 (2004), and Boumediene v. Bush, ___ U.S. ___, 128 S. Ct. 2229 (2008), "hearsay information contained in the regularly prepared intelligence reports that are relied upon in these cases should be deemed sufficiently reliable to be admitted[] unless sufficient credible evidence at the merits hearing establishes that the information is unreliable," Gov't's Mem. at 3. It further advocates that, "[i]n evaluating whether to credit hearsay, the Court should reject general allegations that the reported information is inaccurate or unreliable, including unsupported challenges to the reliability of sources." Id. at 4. Instead, it suggests that, "to demonstrate that hearsay evidence in an intelligence report should not be credited, [the] petitioners should be required to offer credible evidence rebutting the reliability of a document." Id.

The government also devotes considerable energy to explaining the function of and justifying its reliance on the various hearsay documents attached to the petitioner's factual return. As explained by the government, there are "two categories of information" upon which it principally relies: "(1) intelligence reports[] and (2) reports of interviews with the petitioner[] and others." Id. at 4. With respect to the latter category of evidence, the government asserts that "military interrogation reports are relied upon to develop accurate information that may be fed into the broader intelligence cycle," and that "there is no reason to doubt that 'public officials

UNCLASSIFIED//FOR PUBLIC RELEASE.

perform their duties without motive or interest other than to submit accurate and fair reports.'" Id. at 14 (quoting Espinoza v. INS, 45 F.3d 308, 310 (9th Cir. 1995)). Further, given that "the admissions contained in such reports are admissible in ordinary civil or criminal trials," the government contends that "[t]hey should certainly be admissible in the special circumstances of these habeas proceedings." Gov't Mem. at 14. "Likewise," it argues that "a detainee's inculpatory statements against another petitioner will often also implicate the detainee who is making the statement," and should therefore "be presumptively reliable according to the same principles that provide for the admissibility of statements against interest." Id. at 15.

The government opines that "[m]any of the principles described above apply equally to intelligence reports where such reports reflect the statements of another detainee." Id. As for those reports where the source is confidential, the government suggests that the Court can evaluate the source's reliability "based on other evidence in the record." Id. Additionally, the government contends that intelligence reports should be admitted into evidence as a general matter "because intelligence collectors from the [Defense Intelligence Agency (the 'DIA')] and the ███████████████████████████ are trained to consider carefully the reliability and credibility of their human sources." Id. at 16. Moreover, "[b]efore collected intelligence is processed into an intelligence report . . . , analysts in a collecting agency . . . process the information for dissemination to and use by other members of the intelligence community, including intelligence analysts," who rely on the reports "to prepare broader intelligence assessments." Id. at 17.

The petitioner filed his evidentiary objections on June 26, 2009. In support of those objections, the petitioner asserts that "[t]he only two witnesses the government relies upon as implicating [him]—Obaidullah and [a]l[-]Zamel—were both tortured, made false allegations due

UNCLASSIFIED//FOR PUBLIC RELEASE.

to the torture, and have since recanted their allegations as false," Pet'r's Mem. at 3-4, and argues

both that the statements of these witnesses are inherently unreliable as a consequence, id. at 5-22,

25-35, and that "the fruits of torture" should be declared categorically inadmissible in any event,

id. at 23.   The petitioner further argues that al-Zamel's statements are unreliable in general

because they are contrary to other, verifiable facts, id. at 35-39, and because al-Zamel was

"singled out . . . as a self-serving liar" by the Combatant Status Review Tribunal reviewing his

case, id. at 39.   Additionally, the petitioner points out that both Obaidullah and al-Zamel have

recanted the very statements proffered by the government.   Id. at 22, 31-32.

    The petitioner also seeks to exclude a Form 40 (or "FM40") report purporting to

summarize the interview of an anonymous soldier in which the soldier recounts the

circumstances surrounding the apprehension of Obaidullah as "entirely unreliable," id. at 42,[5]

because "[t]he unknown soldier's memory is at best suspect, hardly worthy of credence in the

face of . . . contrary and conflicting evidence of other military sources," id. at 44.   He further

challenges as unreliable an intelligence report "containing," in his words, "nothing more than an

anonymous person's account of internet newspaper stories, a [Department of Defense] press

release, and untested information from private foundations' internet websites," id. at 47, and

objects to the introduction into evidence of raw intelligence reports generally on various grounds,

id. at 54-61.   Finally, the petitioner objects to the introduction of any evidence "attempt[ing] to

attribute [the petitioner's] scars [on his hands and knee] to an explosives blast," id. at 44, and

requests that the Court strike factual findings proposed by the government that are unsupported

or "exaggerate" the sources cited, id. at 49.

---

[5]   This former soldier allegedly claims that Obaidullah implicated a person named "Karim" during the raid on
Obaidullah's family compound, Pet'r's Mem. at 42; however, the government does not seek to introduce these
alleged statements into evidence, see Gov't's Reply at 35 ("The [g]overnment is no longer relying on the soldier's
recollection of Obaidullah's admissions at C3 ▮ [Air Force Base] . . . .").

UNCLASSIFIED//FOR PUBLIC RELEASE.

In response to the petitioner's objections, the government asserts that Obaidullah's statements should be credited because they are detailed and consistent with other evidence, whereas his recantations are implausible, Gov't's Reply at 17-25, and that al-Zamel's statements are also corroborated by other evidence, id. at 25-34. It argues that the anonymous soldier's recollection of the events recorded in an FM-40 "is reliable because the account is detailed and consistent with other evidence," id. at 35, and that "[the petitioner's] generic arguments about the inadmissibility of intelligence reports ignore the nature of the reports at issue here, which were detailed and sufficiently reliable for [United States] forces to undertake a dangerous nighttime raid," id. at 6. The government also contests the petitioner's arguments regarding unsourced proposed factual findings, deeming "[t]he few errors he uncovers [to be] immaterial," id. at 36, and dismisses his objections to the use of public sources on the grounds that "those sources are merely offered as background," id. at 35 n.16.

At the hearing on the merits of the petitioner's objections held on August 6, 2009, the Court sustained the petitioner's objections with respect to the intelligence report referencing unverified public sources, overruled as unripe the petitioner's objection to the introduction of any evidence attempting to establish that the petitioner's scars are the result of a bomb blast based upon the government's representation that it did not seek to introduce any evidence to that effect in its case-in-chief, and denied as unripe the petitioner's request to strike various factual findings proposed by the government. The Court deferred ruling on the remainder of the petitioner's objections and continued the hearing to August 28, 2009. At that August 28 hearing, the Court indicated that it could not rule on the reliability of intelligence reports proffered by the government without considering information regarding the source of the intelligence contained within those reports, and further held that such information could be provided to the Court in

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

accordance with the procedures delineated in the Classified Information Procedures Act (the "CIPA"), 18 U.S.C. app. 3 §§ 1-16 (2006), and in accordance with this Court's ruling in United States v. Libby, 429 F. Supp. 2d 18 (D.D.C. 2006) (Walton, J.), Transcript of August 28, 2009 Status Conference, Bostan v. Obama, Civil Action No. 05-883 (RBW) (D.D.C. filed May 3, 2005).

Between the Court's initial hearing on the merits of the petitioner's evidentiary objections and the continued hearing held on August 28, this member of the Court issued a memorandum opinion delineating the standard of review the Court would employ in assessing the petitioner's challenges to the admissibility of hearsay relied upon by the government as a source of evidence in its proposed factual findings.  In that memorandum opinion, the Court reiterated its commitment to enforcing the two-prong standard for the admissibility of hearsay established by Judge Hogan in his case management order, under which the government must establish both that the proffered hearsay is reliable and that requiring it to substitute a non-hearsay alternative would be unduly burdensome or interfere with the government's national security interests. See Bostan, 2009 WL 2516296, at *2 ("[T]his member of the Court concurs with Judge Hogan as to how the government's legitimate national security interests and the petitioner's compelling interest in securing his freedom should be balanced.").  The Court also "elaborated" on the meaning of the term "undue burden," explaining that (1) "[w]here the government is unable to produce non-hearsay evidence due to its own administrative or bureaucratic errors or lack of resources to amass such evidence, it cannot rely upon its shortage of resources or its own mistakes as justification for the use of hearsay," (2) "it is no excuse for the government's lawyers to assert that there are too many habeas corpus petitions pending before the Court or too few resources allocated to the Department of Justice to compel fidelity to the centuries-old

UNCLASSIFIED//FOR PUBLIC RELEASE.

proscription against the use of [unreliable] hearsay," id., (3) "the government will need to demonstrate why the use of non-hearsay alternatives would be unduly burdensome to the government . . . through the use of statements made under oath by persons with personal knowledge of the matter about which their representations relate," and (4) "the undue burden standard . . . does not mean . . . that hearsay proffered by the government must be admitted into evidence because that is all the evidence that the government has available to it," id. at *3. Finally, the Court "reject[ed] the broader reading of Hamdi and Boumediene advanced by the government," id., declined to follow the rules of evidence employed in the administrative proceedings created by the Detainee Treatment Act of 2005 (the "Detainee Treatment Act"), Pub. L. No. 109-148, 119 Stat. 2680 (2005), Bostan, 2009 WL 2516296, at *4, or adopt the reasoning of Khiali-Gul v. Obama, Civil Action No. 05-877 (JR) (D.D.C. Apr. 22, 2009), Bostan, 2009 WL 2516296, at *4-5, and refused to "defer questions of admissibility until all of the government's evidence has been considered on the theory that the reliability of a particular piece of evidence will generally depend on how it fits within the evidence as a whole," id. at *5 (internal quotation marks omitted).

In a footnote appended to its memorandum opinion, the Court noted that it would issue an order applying the general principles articulated in that decision to specific evidentiary disputes in this case. Id. at 6 n.6. The Court has resisted the urge to reduce its oral rulings to writing in the past out of both practical concerns about the strain placed on the Court's resources by the issuance of numerous written opinions and a concern (in some ways borne out by the government's response to the Court's analysis in its prior memorandum opinion) that a written opinion might complicate rather than clarify the Court's position on these matters. However, the instant dispute between the parties has important ramifications for every other Guantánamo Bay

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

detainee with an active habeas corpus petition pending before this member of the Court. Even more important, the Court is convinced that its oral rulings require further explanation and, in some instances, reconsideration. The Court has therefore revisited the disputes raised by the parties in this case so that it can set forth guiding principles for future evidentiary disputes between the government and petitioners appearing before this member of the Court and apply those principles to this dispute in a deliberate and systematic manner.

## II. Standard of Review

The standard of review governing the petitioner's evidentiary objections is that articulated by the Court in its prior memorandum in this case. As the Court explained in that memorandum opinion,

> [F]or all of the active habeas corpus petitions pending before this member of the Court, the government must establish that any proffered hearsay evidence is admissible either (1) under the Federal Rules of Evidence, as modified by 28 U.S.C. § 2246, or (2) by demonstrating that (a) the proffered hearsay is reliable and (b) that the provision of non-hearsay evidence would unduly burden the government . . . or interfere with the government's ability to protect national security.

Id. at *6. Further, the Court ruled that "the more significant a fact the government seeks to establish through the use of hearsay is, the heavier its burden will [have to] be to justify the Court's consideration of hearsay as a substitute for its non-hearsay alternative." Id. at *2.

## III. Legal Analysis

The sole question presented by the petitioner's objections is whether the hearsay proffered by the government in this case may be admitted into evidence under the standards for admissibility delineated above. In Al Bihani, this Court explained that, generally speaking, the evidence proffered by the government consists of multiple levels of hearsay, all of which must satisfy the two-prong standard for admissibility set forth in Judge Hogan's case management

UNCLASSIFIED//FOR PUBLIC RELEASE.

order and explicated in the Court's prior memorandum opinion in this case. Al Bihani, slip op. at 13-14. Specifically, each piece of evidence proffered by the government consists of at least two levels of hearsay—the source's original statement and the memorialization of that statement in a written report—with an intermediary level of hearsay frequently found in between in the form of the interpretation of the source's statement from the source's native language into English.

Much of the analysis set forth in Al Bihani applies with equal force to this case. As the Court explained in that memorandum opinion, statements made by the petitioner are admissible under Federal Rule of Evidence 801(d)(2), Al Bihani, slip op. at 14-15, whereas statements made by other detainees are not admissible under the exception for statements against interest set forth in Rule 804(b)(3) absent additional information establishing that the statements made were truly against the detainees' interests given the circumstances under which they were made, id. at 15-16. Further, statements made by other detainees cannot be admitted into evidence merely because they are "detailed," id. at 17, or because they are corroborated by other evidence, id. at 17-18. Rather, the government must establish either that specific statements were produced under circumstances that guarantee their trustworthiness, id. at 17, or "that independently admissible evidence can be used to assess whether the source of a particular statement is sufficiently reliable in general to permit the admission of any statements by that source into evidence," id. at 18.

Al Bihani also speaks to the question of the reliability of the interpretations of detainee statements. As the Court explained in that case, interpreters employed by the FBI or interpreters with an International Language Rountable ("ILR") score "of 3+ in a target language and 3 in English are sufficiently reliable to permit the admission of their interpretations into evidence." Id. at 23. However, interpreters not employed by the FBI with an ILR score of 2+ in English

UNCLASSIFIED//FOR PUBLIC RELEASE.

lack sufficient credentials "to ensure that any complex statements rendered in English by such an interpreter are reliable." Id. at 25. "Accordingly, the Court cannot admit into evidence interpretations provided by interpreters with a 2+ score in English except with respect to basic information provided by the detainee." Id. at 26.[6]

Finally, "[i]n the context of detainee statements," the Court ruled in Al Bihani that the government can only introduce interrogation reports purporting to record admissions by the petitioner where the government establishes that:

> [N]ot only . . . would [it] create an undue burden for the government to call the various interrogators who drafted the reports as witnesses at the merits phase of this proceeding, but also that it would create an undue burden for the government to procure affidavits or declarations from these interrogators setting forth the information that would otherwise be elicited on direct examination (e.g., the process used to create the interrogation reports, the circumstances surrounding the interrogation, and the substance of the petitioner's alleged statements (as interpreted by the interpreter)).

Id. at 28-29.

The Court further reasoned in Al Bihani that it did not need to "apply the undue burden prong with the same level of scrutiny" where statements from other detainees were concerned because, at least in that case, statements made by other detainees were "less crucial to the government's case." Id. at 29. The Court cautioned, however, that even with respect to statements made by other detainees, it might "eventually conclude that the reports regarding the

---

[6] The Court also held in Al Bihani that the government did not need to call any interpreters as witnesses or provide affidavits or declarations from those interpreters because "the petitioner [in that case did] not argue that any specific statement allegedly made by the petitioner (or any other detainee) was mistranslated" and because the Court did not perceive any "benefit to subjecting the interpreters used during the petitioner's (or other detainees') interrogations to cross-examination given the substance of the Court's ruling on the question of reliability." Al Bihani, slip op. at 27. In addition, the Court once again warned the government that "if a detainee disputes the accuracy of an interpretation, [it would] both credit such testimony absent evidence to the contrary" and preclude the government from introducing "any evidence regarding the background and credentials of the interpreter who provided the interpretation at issue if such information was not disclosed to the petitioner in discovery." Id. at 24 n.14.

UNCLASSIFIED//FOR PUBLIC RELEASE.

interrogation of other detainees lack sufficient indicia of reliability to be admitted into evidence," which would mean that "the failure of the government to call the interrogators who created the reports or at least submit sworn statements approximating their testimony would preclude the Court's consideration of the substance of those reports." Id. The Court also reiterated that it has "serious concerns" regarding the reliability of interrogation reports prepared by unknown interrogators under unknown circumstances, and "indicated that the government [might] be able to ameliorate those concerns through the submission of individualized affidavits or declarations," id., that explained "the process used to create the interrogation reports, the circumstances surrounding the interrogation, and the substance of the petitioner's alleged statements," id. at 28-29. Alternatively, and "as a last resort," the Court opined that the government might be able to establish the reliability of its interrogation reports "through the submission of a global affidavit describing the process used by interrogators . . . to reduce what was said and the observations made during interrogations into their written reports." Id. at 29.

Thus, the Court's decision in Al Bihani resolves many of the issues present in this case. For example, field documents, or "FD-302s," prepared by FBI agents "to summarize an interview," "Form 40s," also known as "FM 40s," which are used by the Criminal Investigation Task Force "to record investigation activity, such as witness interviews," and summary interrogation reports ("SIRs") "written by the interrogator after an interrogation session," which "contains all the details of the interrogation session, including date and time, language used, interrogation approach, and an evaluation of the detainee regarding his deception and cooperation," as well as "all the intelligence gathered from the session," Gov't's Mem., Ex. 1 (Declaration of ▮▮▮▮▮▮▮▮▮▮▮ Sept. 19, 2008) (the ▮▮▮▮▮▮▮▮ Decl.") at 7, are all explicitly covered by the Court's ruling in that case, see Al Bihani, slip op. at 27-28

UNCLASSIFIED//FOR PUBLIC RELEASE.

(listing these documents). Similarly interrogator notes (e.g., IN T244 MFR (Aug. 7, 2002), attached as Exhibit 36 to the government's factual return, and IN T507 MFR (Feb. 26, 2003), attached as Exhibit 37 to the government's factual return), and so-called "spot reports" memorializing statements made by Obaidullah in response to interrogations (e.g., IN T244 Spot Report (re: 7/2/02 Land-Mine Cache), attached as Exhibit 49 to the government's factual return, and IN T244 Spot Report (re: 7/10/02 Kabul Attack), attached as Exhibit 50 to the government's factual return) must be assessed under the basic format delineated in Al Bihani, though the latter group of documents may prove to be less of a challenge for the government to have admitted into evidence if, as the documents appear to indicate, they were prepared by military personnel in Afghanistan soon after Obaidullah was apprehended. See Gov't's Factual Return, Ex. 49 (IN T244 Spot Report (re: 7/2/02 Land-Mine Cache)) at 1 (indicating that the spot report in question was prepared by a member of "Bravo Company" in Bagram, Afghanistan); id., Ex. 50 (IN T244 Spot Report (re: 7/10/02 Kabul Attack)) at 1 (same).

Nevertheless, three issues raised by the parties require this Court's attention. First, the Court must determine whether intelligence reports proffered by the government memorializing information provided by sources other than Guantánamo Bay detainees may be admitted into evidence under either the Federal Rules of Evidence or the standard for the admission of otherwise inadmissible hearsay set forth in Judge Hogan's case management order. Second, the Court must consider whether any statements allegedly made by Obaidullah and al-Zamel can be introduced into evidence regardless of the form in which they are memorialized given the allegations of those individuals that their inculpatory statements were produced in response to coercive techniques employed by the government. And finally, the Court must assess whether an FM40 purporting to summarizing an interview of an anonymous former soldier can be admitted

UNCLASSIFIED//FOR PUBLIC RELEASE.

into evidence assuming the government can establish that the document is itself admissible under the Al Bihani standard. The Court will consider each of these three issues in turn.

A.      The Intelligence Reports

The first question the Court will address is whether it should admit into evidence certain intelligence reports proffered by the government. These reports consist of at least two levels of hearsay: the statements contained within the intelligence reports, and the intelligence reports themselves. However, the petitioner has not objected to the introduction of the intelligence reports on the grounds that the reports themselves are unreliable or that the government could call the individuals who prepared the reports as witnesses to testify regarding the statements contained within those reports, see Pet'r's Mem. at 54-61 (arguing only that the statements contained within the various intelligence reports proffered by the government are inadmissible because they consist of unverified statements made by sources of unknown reliability). Thus, the Court will confine its analysis to the admissibility of the underlying hearsay contained within the intelligence reports proffered by the government.

As noted above, the petitioner's objection to the admission into evidence of the intelligence reports proffered by the government is that the "reports do not provide sufficient indicia of reliability to allow courts to assess the reliability of the source or the reliability of the information contained therein." Id. at 54. As he sees it, "[r]aw intelligence is essentially unusable until analyzed by a trained source intelligence analyst, who uses the intelligence reports to write finished intelligence ... products." Id. (internal quotation marks omitted). "Such scrutiny is," in the petitioner's view, "impossible where, as here, [the government] redact[s] the source information or refuse[s] to turn over supplemental information necessary to assessing the source's placement and reliability." Id. at 55. The petitioner further complains that "the sources

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

relied upon for proposed facts provide the Court and counsel with little more than a cherry-picked snapshot of the universe of relevant information." Id.

Not surprisingly, the government disagrees with the petitioner's assessment of its intelligence reports. Arguing that "[the petitioner] seeks to impose," in its words, "the Hobson's choice of either revealing the sources [of its intelligence reports] or undermining the [g]overnment's ability to detain him,'" Gov't's Reply at 7, it counters that "in the middle of an armed conflict and a growing insurgency, there is strong incentive for collectors of such intelligence to ensure that the sources are reliable," id. at 7-8. The government finds "[the petitioner's] arguments [to be] particularly unpersuasive here, where [United States] forces relied on such intelligence to undertake an operation in the field, the results of which confirmed the pre-raid reporting."   Id. at 8. Finally, the government argues at length that each of the intelligence reports at issue in this case is detailed and consistent with other evidence. Id. at 9-16.

In assessing the merits of these arguments, the Court is guided in large part by the District of Columbia Circuit's ruling in Parhat v. Gates, 532 F.3d 834 (D.C. Cir. 2008). In that case, the circuit court reviewed the decision made by a Combatant Status Review Tribunal (the "Tribunal" or "CSRT"), a "non-adversarial proceeding[] [created] to determine whether each detainee at Guant[á]namo [Bay] meets the criteria to be designated as an enemy combatant" under Department of Defense regulations, id. at 838 (internal quotation marks omitted), that Huzaifa Parhat, "a Chinese citizen of Uighur heritage," id. at 837, "was an enemy combatant" based "on the theory that he was affiliated with a Uighur independence group" known as the East

---

[7]   By a "Hobson's choice," the government presumably means "two or more undesirable choices." Bryan A. Garner, The Elements of Legal Style 117 (Oxford Univ. Press 2d ed. 2002). In point of fact, the phrase "refers . . . to the option of taking the one thing offered or nothing at all." Id.

UNCLASSIFIED//FOR PUBLIC RELEASE.

Turkistan Islamic Movement (the "ETIM"), which, the Tribunal concluded, was "associated with al[-]Qaida and the Taliban[] and . . . engaged in hostilities against the United States and its coalition partners," id. at 838 (internal quotation marks omitted). "The principal evidence supporting" the latter two conclusions (i.e., that the ETIM was associated with al-Qaida and the Taliban and that it engaged in hostilities against the United States and its coalition partners) "[came] from four [United States] government intelligence documents, one from the Department of State and three from components of the Department of Defense." Id. at 844.

The District of Columbia Circuit reversed that determination. Id. at 854. Among other failings, the court concluded that it could not "assess the reliability of the assertions in the documents" purporting to establish that the ETIM was associated with al-Qaida and the Taliban and that it engaged in hostilities against the United States and its coalition partners. Id. at 847. The Circuit reached that conclusion because the documents did not identify the source of the allegations contained therein, "any of the underlying reporting upon which the documents' bottom-line assertions [were] founded," or "any assessment of the reliability of that reporting." Id. at 846-47. The Circuit reasoned that without the ability to assess the reliability of the government's evidence, it could not carry out Congress's mandate under the Detainee Treatment Act, which was to "determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant," id. at 840 (citing Detainee Treatment Act § 1005(e)(2)(A))—that is,

> whether the status determination of the [CSRT] was consistent with the standards and procedures specified by the Secretary of Defense for [CSRTs] (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence),

UNCLASSIFIED//FOR PUBLIC RELEASE.

Parhat, 532 F.3d at 840 (citing Detainee Treatment Act § 1005(e)(2)(C)) (modifications in original). Thus, the Circuit could not determine whether the CSRT's findings were supported by a preponderance of the evidence because "[b]efore any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." Parhat, 532 F.3d at 847 (quoting Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 622 (1993)). Likewise, the obligation to assess the reliability of the hearsay evidence flowed from the statute's requirement that the government is entitled to a rebuttable presumption in its favor—indeed, the inability to assess the reliability of the evidence would result in an irrebuttable, rather than a rebuttable, presumption because the court could not "ever look behind the presumption to the actual facts." Parhat, 532 F.3d at 847 (quoting Bismullah v. Gates, 501 F.3d 178, 186 (D.C. Cir. 2007)). The Circuit, therefore, concluded that it had an obligation under the Detainee Treatment Act to assess the reliability of all hearsay evidence proffered by the government. See Parhat, 532 F.3d at 854 ("[T]his court [cannot] conclude that [the CSRT's] decision was consistent with [the] standards and procedures [under the Detainee Treatment Act] unless we . . . are able to assess the reliability of the government's evidence.").

In reaching this conclusion, the District of Columbia Circuit rejected the notion, advanced by the government, "that several of the assertions in the intelligence documents are reliable because they are made in at least three different documents," id. at 848, observing that, "Lewis Carroll notwithstanding, the fact that the government has 'said it thrice' does not make an allegation true." Id. (quoting Lewis Carroll, The Hunting of the Snark 3 (1876)). The court also refuted the government's assertion "that the statements made in the documents [were]

UNCLASSIFIED//FOR PUBLIC RELEASE.

reliable because the State and Defense Departments would not have put them in intelligence documents were that not the case," observing that this argument came "perilously close to suggesting that whatever the government says must be treated as true, thus rendering superfluous both the role of the Tribunal and the role that Congress assigned to [the circuit] court." Parhat, 532 F.3d at 849.

The circuit court held instead that the government was required to present its hearsay evidence "in a form, or with sufficient additional information," so as to "permit[] the Tribunal and [the] court to assess its reliability." Id. It suggested that "there may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source," referencing in particular "the use of appropriate nonclassified substitutions under the [CIPA]." Id. Ultimately, however, the court "neither prescribe[d] nor proscribe[d] possible ways in which the government [might] demonstrate the reliability of its evidence," choosing instead to "merely reject the government's contention that it can prevail by submitting documents that read as if they were indictments or civil complaints, and that simply assert as facts the elements required to prove that a detainee falls within the definition of enemy combatant." Id. at 850.

While Parhat addressed the government's evidentiary obligations in the context of a petition for review from a CSRT determination under the Detainee Treatment Act, which is not at issue in this case, the circuit court's observations in that decision apply with equal if not greater force to the petitioner's habeas corpus petition. As this member of the Court has explained repeatedly, the government must establish the reliability of any hearsay that it seeks to introduce into evidence in any of the detainee cases pending before the undersigned member of the Court, just as it was required to do under the Detainee Treatment Act in Parhat. See Bostan,

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

2009 WL 2516296, at *2 (reiterating the Court's commitment to enforcing this requirement in Judge Hogan's case management order); Al Bihani, slip op. at 11 (same). And just as the Tribunal's inability to assess the reliability of the government's evidence rendered the rebuttable presumption of accuracy accorded to that evidence under the Detainee Treatment Act "effectively irrebuttable," Parhat, 532 F.3d at 847, so, too, would the Court's failure to consider the reliability of the hearsay evidence proffered by the government in this case make it virtually impossible for the petitioner to challenge the accuracy of the proffered documents themselves. Thus, this Court is bound by the logic of Parhat in weighing the merits of the parties' arguments regarding the reliability of the intelligence reports proffered by the government.

This does not mean, however, that the government is permanently foreclosed from relying upon intelligence documents as a basis for detaining the petitioner as the petitioner advocates. To the contrary, the court in Parhat made clear that it "[did] not suggest that hearsay evidence [in the form of intelligence reports] is never reliable," but instead concluded only "that it must be presented in a form, or with sufficient additional information, that permits the . . . court to assess its reliability." Id. at 849. Thus, the court decided over the petitioner's objection to remand his case for further proceedings before the Tribunal because it did not know "whether the government ha[d] additional evidence that would cure the reliability issues" identified by the court. Id. at 850.

This Court is also not persuaded by the petitioner's argument that "[r]aw intelligence is essentially unusable until analyzed by a trained source intelligence analyst." Pet'r's Mem. at 54. As set forth in the declaration of ███████████████████████████████████.

███████████████████████████████████████████████████

███████████████████████████████████████ at 1, intelligence collectors

UNCLASSIFIED//FOR PUBLIC RELEASE.

determine the reliability of raw intelligence by looking first at the general description of the source.  Id. at 8.  Factors to be considered in assessing the source in general include ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ id. at 8, the "[s]ource's motivation," and the "[w]ittingness of the source" in light of the source's "knowledge that the [United States] government will receive the information provided," id. at 9.  Once that assessment has been made, the intelligence collector considers "the circumstances in which the source obtained [the] information [provided] in the report."  Id.

The petitioner's belief that these tasks cannot be replicated by "the Court []or [the p]etitioner's counsel" notwithstanding, Pet'r's Mem. at 54, the Court sees no reason why it cannot assess the general reliability of the source providing the intelligence in question as well as the circumstances surrounding that intelligence provided that the government supplements its evidentiary submissions with the information needed to permit such a determination.  Nor is the Court convinced that it would see "a cherry-picked snapshot of the universe of relevant information" regarding the intelligence reports relied upon by the government, id. at 55, given the government's continuing obligation to produce any exculpatory evidence, including evidence undermining the reliability of its intelligence reports, to the petitioner.[8]  The Court will therefore

---

[8] The petitioner seems to suggest some degree of iniquitousness on the part of the government's counsel, noting that "on several occasions [his] counsel has independently obtained reports from that broader universe within [the government's] exclusive control suggesting that . . . the intelligence agencies have contrary information that has not been considered in the cherry-picked data used as sources for the proposed facts." Pet'r's Mem. at 55; see also id. at 6 n.1 ("The [u]nclassified CSRT of Obaidullah . . . is replete with exculpatory evidence . . . that should have been disclosed . . . . as required by this Court's and Judge Hogan's [o]rders requiring disclosure of exculpatory evidence."). Given the volume of evidence amassed by the government in connection with the detainees at Guantánamo Bay as a whole, it is not surprising that the government may have on occasion inadvertently failed to disclose exculpatory evidence to the petitioner.  To the extent that the petitioner believes in good faith that the government is intentionally withholding exculpatory evidence, he is of course free to file a motion to compel or motion for sanctions against the government.  Insinuations to that effect will not alone, however, carry any weight with the Court.

UNCLASSIFIED//FOR PUBLIC RELEASE.

consider the admissibility of the government's proffered intelligence reports on a case-by-case basis rather than reject the reports out of hand as the petitioner advocates.

At least one other member of this Court has reached this same conclusion. In Khan v. Obama, Civil Action No. 08-1101 (JDB), 2009 WL 2524587 (D.D.C. Aug. 18, 2009), Judge Bates of this Court followed Parhat in determining whether intelligence reports proffered by the government provided a basis for detaining Shawali Khan, another Guantánamo Bay detainee. Id. at *2 ("Even under relaxed evidentiary standards, . . . the credibility or reliability of the evidence must be assessable by a court . . . . The interplay between the presumptions [in the government's favor] and the requirement of reliability was squarely addressed in Parhat."). Judge Bates explained the precedential impact of Parhat as follows:

> First, courts must determine whether the evidence relied upon contains enough information to permit an assessment of reliability. If it does, then courts must examine that information and determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention. But if it does not contain enough information, and if it is not corroborated by otherwise reliable evidence, then courts are precluded from assessing the evidence's reliability. And if courts cannot assess reliability, then the evidence in question is inherently unreliable and may not be relied upon to justify detention.

Id. at *3.

This member of the Court respectfully disagrees with Judge Bates insofar as he suggests that hearsay can be deemed reliable if it is "corroborated by otherwise reliable evidence." Id. As the Court explained in Al Bihani, "[t]o the extent that the information within [an otherwise unreliable hearsay] statement mirrors [otherwise reliable] corroborating evidence, its admission into the record would be redundant, and to the extent it differs from the corroborating evidence, it is no longer corroborated and therefore has no external indicia of reliability." Al Bihani, slip op. at 17-18. "Further, the otherwise unreliable evidence, while having no probative effect, will

doubtless create the illusion that the admissible evidence has been corroborated by the otherwise inadmissible evidence even though the otherwise inadmissible evidence, having no indicia of reliability of its own, cannot corroborate anything." Id. at 18 n.11. Thus, the use of otherwise reliable corroborating evidence as a means to assess the reliability of otherwise unreliable hearsay is ultimately misguided, as its ultimate effect is only to possibly mislead the factfinder (in this case, the Court) into thinking that the weight of the government's evidence is greater than it actually is.[9]

In all other respects, however, this member of the Court agrees with Judge Bates's formulation of Parhat's import. Consequently, with respect to the intelligence reports proffered by the government in this case, the Court must first "determine whether the evidence relied upon contains enough information to permit an assessment of reliability," and then "must examine that information and determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention." Khan, 2009 WL 2524587, at *3. This member of the Court further agrees with Judge Bates that the principles used by intelligence collectors to assess the credibility of human intelligence "provide the best set of criteria for a court to use to determine whether the raw intelligence reports [that the government] rel[ies] upon to justify [the] petitioner's detention are reliable and credible." Id. And "[i]f the evidence [that the government] rel[ies] upon to

---

[9]  As an alternative to Judge Bates's approach, this member of the Court has suggested that "independently admissible evidence can be used to assess whether the source of a particular statement is sufficiently reliable in general to permit the admission of any statements by that source into evidence," Al Bihani, slip op. at 18, by "establish[ing] that the statements provided by that source are, in general, factually accurate by a preponderance of the evidence," id. at 19.  This approach reflects Parhat's general observation that "there may well be other forms in which the government can submit information that will permit an appropriate assessment of the information's reliability while protecting the anonymity of a highly sensitive source," Parhat, 532 F.3d at 849, quoted in Khan, 2009 WL 2524587, at *4, and is consistent with the Supreme Court's ruling in Rugendorf v. United States, 376 U.S. 528 (1964), that an affidavit in support of a search warrant containing hearsay may be relied upon "so long as there was a substantial basis for crediting the hearsay," id. at 533, quoted in Khan, 2009 WL 2524587, at *4.  In other words, the approach taken by this member of the Court accords with the very same authorities cited by Judge Bates in Khan for the proposition that, "even if particular evidence is unreliable standing alone, it may nonetheless be reliable if corroborated by other reliable evidence," Khan, 2009 WL 2524587, at *4, and, at least in the estimation of this member of the Court, addresses more adequately the concerns expressed in Parhat and Rugendorf.

UNCLASSIFIED//FOR PUBLIC RELEASE.

justify detention does not provide enough information to permit assessment" of a source's reliability using the criteria outlined above, or otherwise "precludes [the C]ourt from assessing the reliability of the evidence[,] then the evidence cannot be relied upon to justify detention."  Id.

Finally, as the Court has previously explained from the bench, and in accordance with the suggestion of the District of Columbia Circuit in Parhat, the Court will consider source information that has been redacted ex parte and in camera where necessary in accordance with the procedures in the CIPA, as interpreted by this Court in Libby.  Section 4 of the CIPA provides that "[t]he court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents . . . , to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove."  18 U.S.C. app. 3 § 4.  In Libby, this Court delineated the following procedure for considering ex parte submissions under Section 4 of the CIPA where, as here, the opposing counsel has a security clearance:

> Th[e] submission must necessarily include a declaration or affidavit, executed by an intelligence community official with the requisite classification review authority, which (1) describes the reasons for the classification of the information at issue, (2) sets forth the potential harm to national security that could result from its disclosure, and (3) explains why the [petitioner's counsel], based upon appropriate classification guidelines, does not have a "need-to-know the information" in its unaltered form. . . . This showing must detail why the classified documents the government is producing ex parte are of a nature and quality distinguishable from the classified documents already produced to the [petitioner].

429 F. Supp. 2d at 25.

Upon receiving this submission, the Court "will review it and determine whether the filing should remain ex parte, or whether all or some portion of it should be provided to the [petitioner]."  Id.  And if the Court determines that some or all of the withheld information is

UNCLASSIFIED//FOR PUBLIC RELEASE.

material to the petitioner's case but the government nonetheless refuses to disclose the information, the Court may choose to impose sanctions on the government, such as prohibiting its use of the redacted or withheld information. See 18 U.S.C. app. 3 § 6(c)-(e) (providing that where a court refuses to issue an order for "the substitution [of] . . . classified information" with a summary or statement of relevant facts pertaining to that information, and the government "object[s] to [the] disclosure of the classified information . . . ," then the Court shall order such remedial action as it determines is appropriate, including "striking or precluding all or part of the testimony of a witness.").   Additionally, although the CIPA "specif[ies] written submissions" from the government, "[it] do[es] not rule out hearings in which government counsel participate." United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir. 1998).   Thus, while "[e]x parte hearings are generally disfavored," such hearings "are part of the process that the district court may use in order to decide the relevancy of the information."   Id.

With these guiding principles in mind, the Court turns to the specific intelligence documents at issue in this case, which consist of intelligence information reports ("IIRs"), "the main [Department of Defense] reporting vehicle for the [human intelligence] information used by [the] DIA and military services,"                            Decl. at 6,

As an initial matter, most of the IIRs proffered by the government purport to summarize interrogations of various detainees at Guantánamo Bay and, in some instances, are derivative of separate interrogation reports. See Gov't's Return, Ex. 41                    at 1-2 (summarizing statements made by a detainee at Guantánamo Bay bearing the ISN 1045); id., Ex. 42 at 3-4 (summarizing FBI 302 memorializing interrogation of        ; id., Ex. 43              at 6-12 (summarizing FBI 302 memorializing interrogation of the

UNCLASSIFIED//FOR PUBLIC RELEASE.

petitioner); id., Ex. 44 ███████████ at 1-4 (summarizing interrogation of Guantánamo Bay detainee bearing the ISN 703); id., Ex. 45 ███████████ at 1-2 (summarizing interrogation of Guantánamo Bay detainee bearing the ISN 839); id., Ex. 46 ███████████ at 1-2 (summarizing interrogation of Guantánamo Bay detainee bearing the ISN 753); id., Ex. 47 ███████████ ) at 3-8 (summarizing interrogation of Guantánamo Bay detainee bearing the ISN 1021); id., Ex. 48 ███████████ at 2-4 (summarizing interrogation of "a 25-year old ethnic Pashtun male Afghan . . . . in [United States] custody"). Accordingly, these documents are subject to the same requirements previously delineated by this Court with respect to SIRs, FM40s, and the like: namely, to introduce the statements into evidence, the government must demonstrate that the statements allegedly made by the source, if not admissible under the Federal Rules of Evidence, (1) were made under circumstances that render them intrinsically reliable or were made by reliable sources and, (2) with respect to statements crucial to the government's case (i.e., the sources of any statement inculpating the petitioner in a material way, such as Obaidullah) that it would be unduly burdensome to call the sources as witnesses or provide declarations or affidavits under oath in lieu of live testimony, (3) that the statements purportedly made by these sources were interpreted by a reliable interpreter (i.e., an interpreter who works for the FBI or who has an ILR score of at least 3 in English), (4) that the interpreted statements were recorded by the interrogator in a manner that is reliable, and (5) that the interrogator is unable to testify or at least submit a declaration or affidavit approximating such testimony. Al Bihani, slip op. at 14-30. If the government cannot meet these five requirements with respect to each IIR, the IIR for which these conditions have not been satisfied will be excluded from the record.

UNCLASSIFIED//FOR PUBLIC RELEASE.

The Court has already held that ███████████ (attached as Exhibit 39 to the government's factual return) cannot be introduced into evidence because it is sourced to unverified sources on the internet. See supra Part I. That leaves ███████████ (attached as Exhibit 40 to the government's factual return), which purports to summarize "a notebook containing a diagram on how to construct a remote-controlled explosive device." Gov't's Factual Return, Ex. 40 ███████████ at 1. It also states that someone (presumably the owner of the notebook) "received 300 from Abdullah," another "500[,] and then 2,700." Id. at 2.

Assuming the government can establish that the notebook referenced in this IIR belonged to Obaidullah, it can use the IIR to establish that he carried around a notebook containing what amounts to a reference guide on how to construct a bomb. However, unless it can demonstrate the applicability of one of the hearsay exceptions set forth in the Federal Rules of Evidence or otherwise establish that the notes in the notebook were written under circumstances guaranteeing their trustworthiness, the government cannot introduce the notebook into evidence for the truth of the matter asserted therein—i.e., that Obaidullah received various amounts of money from Abdullah Noor—without demonstrating that both the source and the recorder of the contents of the notebook (presumably Obaidullah on both counts) are generally reliable and that it would be unduly burdensome for the government to call this source (or these sources) as a witness (or as witnesses). See infra Part III.B (discussing the undue burden prong of the hearsay standard governing this case with regards to Obaidullah).

███████████████████████████████████████████████
███████████████████████████████████████████ forcing the Court to consider the issue ex parte and in camera consistent with the approach delineated above. The Court has completed this review and has concluded (1) that knowledge of the source

UNCLASSIFIED//FOR PUBLIC RELEASE.

information is not material to the petitioner's case and (2) that the reports are reliable based upon the source information provided by the government ex parte and in camera. Accordingly, the government need not disclose any source information regarding these reports to the petitioner to avoid exclusion, and the reports will be admitted into evidence.

B.    The Alleged Statements of Obaidullah and al-Zamel

The bulk of the petitioner's objections relate to statements made by Obaidullah and al-Zamel, which, the petitioner contends, are unreliable. Pet'r's Mem. at 5-41. With respect to Obaidullah, the petitioner contends that any inculpatory statements proffered by the government are the product of coercion and must be rejected as such. Id. at 5-25. With respect to al-Zamel, the picture is more complicated: at various points, the petitioner argues that any statements made by that witness must be excluded because (1) al-Zamel was also subjected to coercive techniques, (2) statements made by al-Zamel concerning conversations allegedly conducted between him and the petitioner are implausible given the fact that al-Zamel speaks only Arabic and the petitioner speaks only Pashtu, (3) known facts contradict al-Zamel's statements, (4) al-Zamel is a known liar, (5) al-Zamel was enticed by interrogators to provide inculpatory statements against the petitioner, and (6) al-Zamel has subsequently recanted his accusations against the petitioner. Id. at 25-41.

The petitioner's arguments concerning the use of statements allegedly made by Obaidullah under coercive conditions give rise to a number of legal and evidentiary issues. In a typical case, "confessions which are involuntary, i.e., the product of coercion, either physical or psychological," may not be admitted under the Due Process Clause of the Fifth Amendment (or the Fourteenth Amendment in state criminal proceedings), "not because such confessions are unlikely to be true[,] but because the methods used to extract them offend an underlying

principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system," Rogers v. Richmond, 365 U.S. 534, 540-41 (1961), and "because declarations procured by torture are not premises from which a civilized forum will infer guilt," Lyons v. Okla., 322 U.S. 596, 605 (1944). The detainees at Guantánamo Bay, however, have no due process rights. See Kiyemba v. Obama, 555 F.3d 1022, 1026-27 (D.C. Cir. 2009) ("Decisions of the Supreme Court and of this court . . . hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States.").[10]

At the same time, "another legitimate reason to suppress [the fruits of torture] is the 'likelihood that the confession is untrue.'" United States v. Karake, 443 F. Supp. 2d 8, 50-51 (D.D.C. 2006) (quoting Linkletter v. Walker, 381 U.S. 618, 638 (1965)); see also Jackson v. Denno, 378 U.S. 368, 386 (1964) (noting "the probable unreliability of confessions that are obtained in a manner deemed coercive."). This second basis for excluding evidence obtained through coercive means resonates even in the context of these habeas corpus proceedings, as the Court is required by the Supreme Court's decision in Boumediene to "conduct a meaningful review" of "the cause for detention." Boumediene, 128 S. Ct. at 2269. But whereas the former basis for exclusion invites a categorical prohibition of the kind required by the Due Process Clause, the latter basis does not, for it is at least conceivable that the government could establish either that a specific witness (in this case, Obaidullah) consistently produced accurate

---

[10] The petitioner suggests in a footnote that "[t]he Supreme Court's decision to vacate and remand the [District of Columbia] Circuit's decision in Rasul v. Myers, 512 F.3d 644 (D.C. Cir. 2008) [('Rasul I'),] demonstrates the continuing recognition that the Fifth Amendment of the Constitution prohibits the United States from engaging in torture, no matter who the subject of that torture may be," Pet'r's Mem. at 24 n.8 (citing Rasul v. Myers, ___ U.S. ___, ___, 129 S. Ct. 763, 763 (2008) ("Rasul II")). In point of fact, the District of Columbia Circuit noted in Rasul v. Myers, 563 F.3d 527 (D.C. Cir. 2009) ("Rasul III") that in Boumediene (the decision that led the Supreme Court to vacate Rasul I, see Rasul II, ___ U.S. at ___, 129 S. Ct. at 763 (vacating Rasul I "in light of Boumediene")), the Supreme Court "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions[] other than the Suspension Clause," and that as a consequence the court "[had to] adhere to the law of [its] circuit," Rasul III, 563 F.3d at 529; i.e., the conclusion reached by the District of Columbia Circuit in Rasul I that "Guant[á]namo detainees lack constitutional rights because they are aliens without property or presence in the United States," Rasul I, 512 F.3d at 663.

UNCLASSIFIED//FOR PUBLIC RELEASE.

information even when subjected to coercive tactics, or that certain techniques employed by the government, even if coercive, are generally successful in producing reliable information. This kind of factual inquiry would amount to a virtual trial over the efficacy of torture itself—a prospect the Court finds both distasteful and distracting.

The petitioner's argument that Obaidullah's inculpatory statements should be excluded as the product of coercive techniques is further complicated by the fact that he supports his assertions of torture by recourse to hearsay, a form of evidence he finds objectionable in other circumstances. Specifically, the petitioner relies upon the following to support his assertion that Obaidullah was subjected to coercive techniques: (1) a written summary of Obaidullah's testimony at his CSRT proceeding, (2) a number of FM40s summarizing interviews of Obaidullah and soldiers at         Air Force Base, where Obaidullah was initially detained, (3) interrogation reports regarding Obaidullah and Wazir, including one suggesting that Obaidullah be subjected to "an adjusted sleep schedule," (4) passages from a book, newspaper articles, and a medical web site, (5) the purported transcript of an interview of a former guard at Guantánamo Bay posted on another web site, and (6) reports prepared by the Office of the Inspector General of the United States Department of Justice and the Committee on Armed Services of the United States Senate. See Pet'r's Mem. at 5-22 (citing various exhibits produced by the petitioner in support of his assertion that Obaidullah was subjected to coercive techniques). The petitioner has not yet even attempted to demonstrate that these documents, each containing hearsay in one form or another, are admissible under the hearsay standard governing the introduction into evidence of the government's proffered hearsay under the unique circumstances of these

UNCLASSIFIED//FOR PUBLIC RELEASE.

Guantánamo Bay detainee cases,[11] let alone the Federal Rules of Evidence.  Consequently, the Court cannot consider these documents as a basis for excluding Obaidullah's purportedly inculpatory statements at this time.

Ultimately, however, the Court need not decide whether Obaidullah's alleged statements were coerced or whether such statements must be excluded if they were the product of the coercion because the government has not made a threshold showing that the statements in question are reliable or that it would be unduly burdensome for the government to call Obaidullah as a witness at the merits phase of this proceeding.  Instead, the government argues that his "admissions implicating [the petitioner] are consistent with other evidence" and "should be considered in the context of the evidence as a whole"—arguments rejected by the Court in Al Bihani and Bostan, respectively.  Gov't's Reply at 17; see also Al Bihani, slip op. at 17 ("[T]he existence of evidence corroborating a specific statement made by a declarant . . . does not assist the Court in determining the reliability of the form . . . in which that information is presented."); Bostan, 2009 WL 2516296, at *5 (refusing to "defer questions of admissibility until all of the government's evidence has been considered on the theory that the reliability of a particular piece of evidence will generally depend on how it fits within the evidence as a whole" (internal quotation marks omitted)).  It also argues that Obaidullah's statements were, on various occasions, "extremely detailed," Gov't's Reply at 21; see also id. at 3 ("Obaidullah's detailed

---

[11]  The Court has previously expressed some ambivalence about applying Judge Hogan's two-prong standard to determine whether otherwise inadmissible hearsay proffered by the petitioner should nevertheless be entered into evidence.  See Al Bihani, slip op. at 12 n.6 (finding it "unclear . . . whether the petitioner should be permitted to introduce otherwise inadmissible hearsay in this case under any circumstances, let alone the circumstances delineated [in Al Bihani] with respect to the government" given that "the Supreme Court mentioned only the possibility of considering hearsay proffered by the government in Hamdi and Boumediene.").  At a minimum, the petitioner should not assume that the Court will employ the same standard for admitting into evidence any otherwise inadmissible hearsay proffered by the petitioner that it has employed with respect to the government's proffered hearsay.  On the other hand, the government should be aware that the Court has concerns about requiring the petitioner to play by different rules of admissibility.

UNCLASSIFIED//FOR PUBLIC RELEASE.

confessions at Bagram implicating [the petitioner] are reliable because they are detailed and consistent with other evidence . . . ."); id. at 18 (noting the "detailed accounts of the operations of the [petitioner's alleged bomb] cell."), but the Court rejected this argument in Al Bihani as well, see Al Bihani, slip op. at 17 (explaining that, while "the level of detail provided in a specific statement may have some impact on the credibility of the substance of the statement once it is found to be reliable," it "does not provide any assistance in determining whether the form in which this information is presented is sufficiently reliable for the substance of the statement to be considered in the first instance.").

Moreover, the government has not even attempted to demonstrate that it would be unduly burdensome to call Obaidullah, who is still detained at Guantánamo Bay, as a witness in this case.[12]   Given the centrality of Obaidullah's statements to the government's case, the government cannot skirt this issue as it did with the comparatively less important witnesses at issue in Al Bihani. Instead, the government must establish that it would be unduly burdensome to call Obaidullah as a witness or, failing that, to provide a sworn statement setting forth the testimony that Obaidullah would provide were he called to the witness stand. Until this prong of the hearsay standard is satisfied and the government has established his reliability as a witness in general (or demonstrated the applicability of one of the hearsay exceptions set forth in the Federal Rules of Evidence), the government cannot rely upon any statements allegedly made by Obaidullah.

---

[12]  Counsel for the government has opined that it is "highly unlikely" that counsel for Obaidullah would permit him to testify on behalf of either the government or the petitioner. Transcript of August 28, 2009 Status Conference at 10, Bostan, Civil Action No. 05-883. Setting aside the question of whether Obaidullah could invoke any privilege against self-incrimination given that he has no due process rights, the Court recognizes that it might be unduly burdensome, if not impossible, as a practical matter to call Obaidullah as a witness on its behalf if he refuses to testify. However, before any finding of undue burden can be made, the government must at least attempt to call him as a witness or, failing that, attempt to acquire an affidavit or declaration from him regarding the matters it would otherwise question him about at a hearing.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

These conclusions with respect to Obaidullah directly affect the admissibility of al Zamel's alleged statements. As the government concedes, his alleged statements are for the most part made up of yet more hearsay in the form of alleged "admi[ssions]" made to al-Zamel by the petitioner and Obaidullah. Given that the Court has provisionally excluded any statements made by Obaidullah pending further submissions by the government, there is no need to consider at this time whether al-Zamel's recounting of alleged statements by that witness is separately admissible.

As for the petitioner's alleged admissions to al-Zamel, they must be excluded for a separate reason. The government freely admits that the statements allegedly made by the petitioner were not made to al-Zamel directly, but rather were interpreted by another detainee, Omar Khadr, from the petitioner's native Pashtun into Arabic. Gov't's Reply at 29. The government has not established (and presumably cannot establish) that Khadr was sufficiently proficient in both Arabic and Pashtun to accord his putative interpretations any presumption of reliability. See Al Bihani, slip op. at 21-27 (discussing the minimum requirements for interpretations of statements to be considered sufficiently reliable to permit their admission into evidence). Accordingly, any statements allegedly made by the petitioner to al-Zamel through Khadr must be excluded based on the current record.

To the extent the government seeks to rely on any statements made by al-Zamel other than his representations as to what he was told by Obaidullah or the petitioner (or to the extent the government is able to convince the Court that Obaidullah's statements are admissible based upon any supplemental submissions and argument presented to the Court), it will need to establish "(1) that the circumstances surrounding the creation of the hearsay are such that the hearsay is inherently reliable or (2) that the source of the hearsay is generally reliable, thereby

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

giving rise to a presumption of reliability as to any hearsay statements provided . . . by [al-Zamel]." Id. at 19. The government has not yet attempted to satisfy this standard. Until it does, al-Zamel's statements must be excluded as unreliable hearsay.

The Court does, however, side with the government on one point regarding al-Zamel. Given that he is by all accounts outside the jurisdiction of the United States and free from the government's custody, the Court finds that al-Zamel is unavailable to testify as a witness within the meaning of Federal Rule of Evidence 804(a) and that as a consequence it would be unduly burdensome to require the government to call him as a witness. See October 23, 2009 Order, Al Bihani v. Obama, Civil Action No. 05-2386 (RBW), at 5 ("[T]he Court considers it axiomatic that the government should not be required to call as a witness in this case an individual who would be considered unavailable in an ordinary civil lawsuit."). In other words, the government need only supplement its submissions with regards to the reliability of al-Zamel as a witness (or provide sufficient evidence to convince the Court by a preponderance that his statements were made under circumstances guaranteeing their trustworthiness), as it has already satisfied the undue burden prong of the hearsay standard governing this case.

C.    Interview of Anonymous Soldier

The final issue before the Court is the admissibility of an FM 40 purporting to summarize an interview of a former soldier that took place on December 18, 2006. Gov't's Return, Ex. 21 (FM 40 (Dec. 18, 2006)) at 1. As with the sources of the information contained within ███████ submitted by the government, the identity of this former soldier is redacted from the FM 40; however, the government has indicated in its ex parte, in camera submission to the Court that the identity of the former soldier has been declassified and will be disclosed to the petitioner. It is therefore incumbent upon the government to demonstrate how it would be unduly burdensome to

UNCLASSIFIED//FOR PUBLIC RELEASE.

call this former soldier as a witness at the merits phase of this case given that the witness is apparently no longer a member of the military and apparently resides in or near the Washington, D.C. metropolitan area. Id. The Court will therefore defer any ruling as to the reliability of the former soldier's statements in the FM 40 until it is clear whether the former soldier will be called as a witness by the government and, if not, whether the government may substitute the FM 40 memorializing his interview instead.

## IV. Conclusion

This memorandum opinion is the third in a series of decisions resolving various evidentiary issues common to the detainees at Guantánamo Bay with habeas corpus petitions actively proceeding before this member of the Court. A casual reader might infer from the tenor of those decisions that the Court finds the government's evidence unacceptable. Not so. With minor exceptions, the Court has not categorically excluded any of the evidence presented by the government, nor is it doing so in this memorandum opinion.

Instead, what the Court has consistently done in these cases is require the government to support its arguments for admissibility with the best evidence available and in a manner that guarantees some modicum of trustworthiness in the proffered evidence. That this requirement has proven so difficult for the government to accept is troubling in and of itself, for the basic guidelines set forth by the Court—that the government should use otherwise inadmissible hearsay only when it truly needs to do so and the hearsay is reliable—would not be considered onerous or controversial in virtually any other type of proceeding. But these strictures concern the manner in which the government's proffered evidence has been presented to the Court, not the evidence itself, and it may well be the case that much if not all of the hearsay proffered by

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

the government will be admitted into the record once the government has (to the extent possible) shored up its evidentiary submissions in the manner required by the Court.[13]

For now, at least, the Court expects that the government, having been placed on notice of the rulings delineated above and in the Court's earlier rulings, appreciates what it needs to do to supplement its evidentiary submissions and will do so (if it can) in an expedited manner. The Court will therefore direct the government to supplement its evidentiary submissions within thirty days of the entry of the order accompanying this memorandum opinion, with any response from the petitioner to follow within fourteen days thereafter. In light of these new deadlines, the Court will reschedule the status hearing currently scheduled for October 27, 2009, at 9:00 a.m. to another date and time to be determined in consultation with counsel for the parties.

Finally, while the Court has regularly granted requests for extensions of time by the government in response to its preliminary evidentiary rulings because the requested extensions have to this point been of a reasonable duration and the rulings made by this member of the Court differ in some respects from other members of the Court, the window of time in which the government could credibly claim to be surprised by the outcome of these evidentiary disputes has now closed. The Court therefore expects that the government will abide by its rulings from this point forward with respect to all of the active habeas petitions from Guantánamo Bay pending before this member of the Court, and will look with disfavor upon any requests by the government for extensions of time with respect to those habeas petitions that have not yet reached the evidentiary phase of the proceedings. The path to resolving these cases chosen by

---

[13] For example, the government may be able to demonstrate, through the testimony or sworn statements of interrogators, that the circumstances under which Obaidullah and al-Zamel provided their purportedly inculpatory statements to Guantánamo Bay interrogators are such that the statements truly were statements against interest under Federal Rule of Evidence 804, in which case many of the concerns raised by the Court with respect to the admission of those statements would dissipate.

UNCLASSIFIED//FOR PUBLIC RELEASE.

UNCLASSIFIED//FOR PUBLIC RELEASE.

this member of the Court has been a comparatively slower one, but the Court intends now to proceed with all deliberate speed with respect to resolving all of the cases pending before it from this point forward.

     **SO ORDERED** this 23rd day of October, 2009.

REGGIE B. WALTON
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE.