UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KARIM BOSTAN, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> BARACK H. OBAMA, ) <br> President of the United States, et al., ) <br> ) <br> Respondents. ) <br> ) | Filed with Classified <br> Information Security Officer <br> CISO _____ <br> Date __10/12/2011__ <br> Civil Action No. 05-883 (RBW) |

## MEMORANDUM OPINION

Currently before the Court is Karim Bostan's (ISN 975)[1] petition for a writ of habeas corpus, in which he argues that he should be released from the United States detention facility in Guantanamo Bay, Cuba, Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Amended Pet.") ¶ 1, because his detention is not statutorily authorized under the Authorization for the Use of Military Force (the "AUMF"), Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001), id. ¶ 15. The government opposes the petitioner's habeas petition on the grounds that he "was a member of an al[-]Qaeda bomb cell dedicated to attacking [United States] and coalition forces in the Khowst region of Afghanistan in the summer of 2002," Merits Hearing Transcript ("Hr'g Tr.") at 5:22-24, thereby rendering him detainable under the AUMF, id. at 5:25-6:3. After carefully considering the evidence presented by both parties and the arguments of counsel during the merits hearing that commenced on June 20,

---

[1] "ISN" is the acronym for "Internment Serial Number." Al-Harbi v. Obama, Civil Action No. 05-2479 (HHK), 2010 WL 2398883, at *3 n.2 (D.D.C. May 13, 2010). Each of the detainees currently housed at Guantanamo Bay has been assigned an ISN. Id.

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

2011, and concluded on June 23, 2011, as well as the various documents that have been filed by the parties in this matter and the exhibits attached to these filings,[2] the Court concludes for the following reasons that the petitioner's petition for a writ of habeas corpus must be denied.

## I.     Background

Prior to his detention, the petitioner resided in Khowst, Afghanistan, Joint Stmt. at 12, where he owned two businesses in the local bazaar—a market consisting of a "series of units . . . that have pulled[-]down steel doors." Hr'g Tr. at 53:9-11; see also Joint Stmt. at 12 (stipulation by the parties that the petitioner "owned two shops in Khowst, Afghanistan"). One of the businesses operated by the petitioner sold "grocery items, such as teas, rice, gum, soap, shampoo, batteries, biscuits, sugar, sweets, green beans[,] and the like." Joint Stmt. at 1. The other business involved the sale or rent of "a variety of party supplies, including[] pots, pans, and party decorations made of gatay," id., which, according to petitioner's counsel, is "almost like a papermaché used for celebratory events, weddings, and the like," Hr'g Tr. at 17:17-19. "Over a period of time," the petitioner would partner with other individuals "to assist him" with operating the businesses, "especially when he needed to travel to purchase goods for sale in his shops." Joint Stmt. at 1.

One of the petitioner's business partners was an individual by the name of Obaidullah (ISN 762), Joint Stmt. at 12, a current detainee at the Guantanamo Bay Naval Base whose petition for a writ of habeas corpus was recently denied by Judge Richard J. Leon of this Court on March 23, 2011, Obaydullah v. Obama, 774 F. Supp. 2d 34, 35 (D.D.C. 2011). The petitioner met Obaidullah through their association with the Jamaat al-Tablighi, Joint Stmt. at 12, "an

---

[2] In addition to the evidence and arguments presented by the parties at the merits hearing, the Court considered the following documents in reaching its decision: (1) the government's Factual Return; (2) the petitioner's Traverse; (3) the Supplement to the Traverse; and (4) the parties' Joint Pre-Trial Statement (the "Joint Stmt.").

2

~~SECRET~~

Islamic missionary organization that is a Terrorist Support Entity 'closely aligned' with al Qaeda," Almerfedi v. Obama, ___ F.3d ___, ___, 2011 WL 2277607, at *4 (D.C. Cir. June 10, 2011). The partnership between Obaidullah and the petitioner ultimately dissolved as a result of money Obaidullah owed the petitioner. See Hr'g Tr. at 18:5-6 (statement by petitioner's counsel that the petitioner and Obaidullah's partnership "ended badly with Obaidullah owing [the petitioner] a large amount of money").

"During the summer of 2002," United States military personnel "in the Khowst area had been subjected to distinctive and very specialized [improvised-explosive-device] attacks that were similar in design, including using landmines as the explosive charge." Gov't's Exhibits, Exhibit ("Ex.") 27 (April 7, 2011 Declaration of [redacted]³ ¶ 5. [redacted] Acting on this intelligence, Colonel³ [redacted] who was "the commanding officer in charge of a military unit that included American Special Forces soldiers," id. ¶ 4, took his unit to a "compound west of Kho[w]st" owned by Obaidullah, where the soldiers prepared to conduct "a nighttime raid" of the compound, id. ¶ 6. Prior to approaching the compound, Colonel³ [redacted] and the members of his unit searched a site that "was adjacent to[,] and across the street from[,] the

3

~~SECRET~~

Obaidullah compound," where they found improvised-explosive-device "components and a portion of a detonator, as well as a significant amount of blood, parts of a hand, and fingers." Id. Then, several members of Colonel ▓ unit, including Sergeant ▓ and a Pashto linguist, approached and knocked on the compound's door. Gov't's Exhibits, Ex. 26 (Sept. 24, 2010 Declaration of ▓) ¶ 4. "[T]he door was answered by an individual who spoke to the linguist," and that individual ultimately "allowed [the] Special Forces [members] to enter the compound." Id.

Upon entering the compound, the soldiers asked the individual at the door to identify the occupants of the compound, and he identified one of the individuals as "Faizel Karim," Hr'g Tr. at 62:23-25, who was later discovered to be Obaidullah's brother, Hr'g Tr. at 64:14 (quoting Pet'r's Exhibits, Ex. 455 (SIR Mar. 21, 2003)) at 1). The soldiers also observed two cars, id., one of which "had blood stains in the backseat." Gov't's Exhibits, Ex. 27 (April 7, 2011 Declaration of ▓ ¶ 7. Sergeant ▓ then confronted Obaidullah and "conducted a pat[-]down search of" him, which resulted in Sergeant ▓ recovering "a small red notebook in the pocket of [Obaidullah's] shalwar kameez (traditional Afghan clothing)" that contained "writings and drawings." Id., Ex. 26 (Sept. 24, 2010 Declaration of ▓ ¶ 5. Obaidullah "initially claimed that the drawings in the notebook were for a generator, but based upon [Sergeant ▓ training and experience, [he] could tell that the schematics . . . were not for a generator, but . . . for explosive devices." Id. The linguist accompanying Colonel ▓ unit also confirmed that that the notebook was a bomb-making manual because "the word [']bomb['] or [']mine['] was written on it." Id., Ex. 25 (Nov. 24, 2009 Declaration of ▓ ▓ at 1. "When confronted with the contents of the notebook, [Obaidullah] stated that it

4

~~SECRET~~

[had been] given to him by Karim." Id., Ex. 26 (Sept. 24, 2010 Declaration of ▆ ¶ 5. The soldiers then took Obaidullah into custody. Id. ¶ 6.

After the raid of Obaidullah's compound, Colonel ▆ unit continued its search for "Karim." Gov't's Exhibits, Ex. 27 (Apr. 7, 2011 Declaration of ▆ ¶ 8. "Approximately one week after the Obaidullah raid," Colonel ▆ unit entered another compound located in the village of Ayub Kheyl, which was located "approximately 15 to 16 kilometers from the Pakistan border." Id. Although the unit located "an old Taliban bomb maker who had a serious leg injury and was immobile," the unit concluded that this individual "was not ['Karim'] . . . and [they] referred [the bomb maker] to the local Afghan authorities." Id. The unit then travelled to yet another compound located approximately 600 meters away from Ayub Kheyl, but the unit was not able to locate Karim at that facility either. Id.; see also id. ¶ 9 (stating that "the search for Karim" continued after the raid in Ayub Kheyl").

"[A]pproximately two weeks later," Colonel ▆ unit arrived at a "compound in the village of Wazyan, [located] about ten kilometers [s]outhwest of Khowst." Id. ¶ 9. Upon arriving at the compound, Colonel ▆ unit was "engaged by a local Afghan firing an AK-47." Id. The individual was later identified as Shams Ullah, who is the petitioner's nephew. See id. (statement by Colonel ▆ that the individual firing the AK-47 was "Karim's nephew"); Hr'g Tr. at 19:18-20 (acknowledgement by petitioner's counsel that "Shams Ullah is the nephew of [the petitioner]," and that "[h]e did shoot" at Colonel ▆ unit at the Wazyan compound); Joint Stmt. at 12 (stipulation by the parties that Shams Ullah is the petitioner's nephew). Ullah was ultimately taken into custody by Colonel ▆ unit, see Hr'g Tr. at 19:18-19 (representation by petitioner's counsel that "Shams Ullah became a detainee"), but "Karim" was not found at the compound, see Gov't's Exhibits, Ex. 27 (Apr. 7, 2011 Declaration of ▆

5

[REDACTED] ¶ 9 (statement by Colonel [REDACTED] that he believed "Karim . . . [was] able to escape the compound"). Colonel [REDACTED] and his unit "never captured [']Karim['] and [had] no . . . interactions with him after this raid." Id. at 10.

In August of 2002, Joint Stmt. at 8, the petitioner, after staying with his uncle for approximately two nights, went to the bus stop located in Miram Shah, Pakistan, where he encountered an individual named Abdullah Wazir (ISN 976), Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 4. Wazir "was, at a minimum, an acquaintance" of the petitioner "through their involvement with Jamaat al-Tablighi." Joint Stmt. at 12. The petitioner and Wazir conversed for approximately fifteen to twenty minutes at the bus stop before boarding the bus for Peshawar, Pakistan, Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 4-5; see also Joint Stmt. at 12 (stipulation by the parties that the petitioner "and Wazir were both riding on the same bus on the segment from Miram Shah toward Peshawar, Paksitan"). "While on the way to Peshawar, [the bus] stopped at a transfer station in Nawrak Village." Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 5; see also Joint Stmt. at 12 (stipulation by the parties that "the bus [that] Bostan and Wazir took into Pakistan made a stop in Nawrak"). The petitioner and Wazir exited the bus, and Wazir went "to visit a friend at a [nearby] mosque,"[4] Joint Stmt. at 12, while the petitioner "wait[ed] under [a] tree," Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 5.

After Wazir returned from the mosque, the petitioner and Wazir boarded a bus to continue their trip to Peshawar.[5] See Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 5. Upon their arrival at a security checkpoint in "the Mirali Bazaar," id., Pakistani security officers

---

[4] According to the government, the petitioner and Wazir's stop in Nawrak is significant because Abu al-Laith al-Libi, a senior al-Qaeda leader, Joint Stmt. at 13, maintained his headquarters and residence in that area, Hr'g Tr. 345:17-18.

[5] It is not clear from the record whether the petitioner and Wazir reboarded the original bus that had taken them from Miram Shah to Nawrak, or whether they boarded another bus to continue their journey to Peshawar.

~~SECRET~~

boarded the bus and ordered some of the passengers to "exit the bus to be searched" because, according to the petitioner, the officers "were suspicious" that some of the passengers were members of al-Qaeda, id. at 6. "After the [authorities] searched a couple of passengers," Wazir was then asked to exit the bus by the officers; he complied with the order, but while leaving the bus, Wazir handed the petitioner a cellular telephone that he had in his possession. Id. The petitioner then attempted to "hid[e] the phone [after] it was passed to him." Id. According to the petitioner, Wazir provided the petitioner with the telephone because Wazir did not want the officers to confiscate it. Id. One of the officers noticed the telephone transfer, however, and the officer asked the petitioner to exit the bus as well. Id.

Outside of the bus, the security officers accused Wazir of being a member of al-Qaeda "because of the large amount of money that [Wazir] had in his possession," id., namely, "$2,700 U.S. dollars, 3,600 Pakistani rupees[,] and 70,000 Afghan rupees," Joint Stmt. at 12, which the officers confiscated, Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 6. The security officer then tried to turn on Wazir's cellular telephone, but "it did not work." Id. When asked "why he was carrying a broken phone," Wazir explained "that the phone could only be repaired in [Pakistan] since no one" can repair it in Afghanistan. Id. Security personnel then arrested both the petitioner and Wazir "and took them to a prison in Miram Shah." Id. On a date unknown to the Court, the petitioner was transferred to United States custody, and he is currently being held by the United States military at the Guantanamo Bay Naval Base in Guantanamo Bay, Cuba. See Amended Pet. ¶ 4.

The petitioner filed a pro se habeas corpus petition on May 3, 2005, which he later amended with the assistance of counsel on December 15, 2005, seeking, inter alia, "release . . . from his current unlawful detention." Amended Petition for Writ of Habeas Corpus and

7

~~SECRET~~

Complaint for Declaratory and Injunctive Relief at 29. Having "serious questions concerning whether this Court retain[ed] jurisdiction" as a result of Congress's attempt to strip this Court of jurisdiction by passing the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (codified in part at 28 U.S.C. § 2241) (the "2006 MCA"), the Court stayed the proceedings in these cases until the question of jurisdiction was resolved on appellate review. January 31, 2007 Order at 1, Bostan v. Bush, Civil Action No. 05-883 (RBW) (D.D.C. Jan. 31, 2007). The stay in this case was later lifted after the Supreme Court issued its opinion in Boumediene v. Bush, 553 U.S. 723 (2008), July 29, 2008 Order at 2, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.), in which the Supreme Court held that non-United States citizens detained at Guantanamo Bay are constitutionally entitled to seek habeas relief and that the 2006 MCA's jurisdiction-stripping provision was "an unconstitutional suspension of the writ" of habeas corpus, Boumediene, 553 U.S. at 792.

In light of the Boumediene decision, the members of this Court on July 1, 2008, "resolved by Executive Session to designate" the Honorable Thomas F. Hogan of this Court "to coordinate and manage proceedings in all cases involving petitioners presently detained in Guantanamo Bay, Cuba."[6] July 2, 2008 Order at 1, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.). After carefully considering the positions of the various parties in these cases, Judge Hogan issued a case management order on November 6, 2008, which outlined the procedural and substantive contours for resolving these habeas

---

[6] As noted in Judge Hogan's July 2, 2008 Order, "[e]xcluded from reassignment are all cases over which Judge Richard J. Leon presides as well as Hamdan v. Bush, 04-cv-1519 (Robertson, J.)." July 2, 2008 Order at 2 n.1, In re Guantanamo Bay Detainee Litigation, Miscellaneous No. 08-442 (TFH) (D.D.C.).

8

~~SECRET~~

petitions.[7] Pursuant to this order, the government then filed its classified Factual Return in this case on September 29, 2008, in which it proffered the evidence it intended to rely upon in this proceeding to justify the petitioner's detention. In turn, the petitioner responded to the evidence proffered by the government in his Traverse, which he filed on April 23, 2009, and later supplemented on April 29, 2009. With all discovery having been completed and the matter having been fully briefed, the Court commenced a hearing on July 20, 2011, to consider the merits of the petitioner's petition for a writ of habeas corpus.

## II. Standard of Review

The ultimate question for the Court to address in resolving the petitioner's habeas petition is whether the government's detention of the petitioner is lawful under the AUMF. While the Supreme Court in Boumediene held that individuals detained by the government at Guantanamo Bay are "entitled to the privilege of habeas corpus to challenge the legality of their detention," Boumediene, 553 U.S. at 771, it also concluded that "[t]he extent of the showing required of the Government in these cases [was] a matter [left] to be determined" in future proceedings," id. at 787. The development of the detention standard in these Guantanamo Bay habeas cases was thoroughly explored by this Court in Sulayman v. Obama, 729 F. Supp. 2d 26 (D.D.C. 2010) (Walton, J.), and it need not repeat that analysis here. Suffice it to say that

> under the law of this circuit, the government may establish the lawfulness of the petitioner's detention by showing that he "engaged in hostilities . . . against the United States," that he "purposefully and materially supported hostilities against the United States or its coalition partners," or that he "is part of the Taliban, al Qaeda, or associated forces." And, the determination of whether an individual is "part of" the Taliban, al Qaeda, or associated forces is one that "must be made on a case-by-case basis by using a functional rather than a formal approach." Moreover, the government may seek to justify detention by making a showing

---

[7] Judge Hogan subsequently amended his case management order on December 16, 2008, and this member of the Court issued several amendments to the order on December 19, 2008, February 19, 2009, and June 12, 2009.

9

that the detainee was part of the "command structure" of either the Taliban, al Qaeda, or their associated forces, yet it is not necessary for the government to make such a showing. But, the government must do more than just prove that the detainee was an "independent . . . freelancer."

Id. at 33 (internal citations omitted).

As for the burden of proof required to justify detention, the Court noted in Sulayman that the standard set forth in Judge Hogan's case management order—"to wit, that the government has the burden of persuading the Court that the petitioner is detainable under the AUMF by a preponderance of the evidence"—has been accepted by the District of Columbia Circuit.[8] Id.; see also Awad v. Obama, 608 F.3d 1, 10 (D.C. Cir. 2010) (citing Al-Bihani v. Obama, 590 F.3d 866, 878 (D.C. Cir. 2010)) ("We have already explicitly held that a preponderance of the evidence standard is constitutional in evaluating a habeas petition from a detainee held at Guantanamo Bay."). This means that the government must convince the Court "to believe that the existence of a fact is more probable than its nonexistence." Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (internal quotation marks omitted). Accordingly, the government has the initial burden of producing evidence in support of its claim for detention, and should the government produce evidence sufficient to establish a prima facie case for detention, then the burden of producing evidence to rebut the government's case shifts to the petitioner. See Hamdi v. Rumsfeld, 542 U.S. 507, 534 (2004) (observing that "once the Government puts forth credible evidence that the habeas petitioner

---

[8] As the Court observed in Sulayman, the District of Columbia Circuit has "left open the question of whether a lower standard of proof could constitutionally suffice as well." 729 F. Supp. 2d at 26 n.5 (citing Al-Bihani, 590 F.3d at 878 n.4.); see also Al-Adahi v. Obama, 613 F.3d 1102, 1103-04 (D.C. Cir. 2010) (noting that it was not "aware of [any] precedents in the eighteenth[-]century English courts [that] adopted a preponderance standard," and that the standard of proof applied in various habeas proceedings ranged from "some evidence to support the order" to "probable cause"). However, given that the government in this case has established the lawfulness of the petitioner's detention by a preponderance of the evidence, the Court need not resolve the standard-of-proof question left open by the Circuit.

10

meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria," and that such a "burden-shifting scheme" does not offend the Constitution). After both parties have presented all of their evidence, the Court must weigh the evidence to determine whether the government has met its burden of showing that its evidence "is . . . more convincing than the evidence . . . offered in opposition to it." Greenwich Collieries v. Dir., Office of Workers' Comp. Programs, 990 F.2d 730, 736 (3d Cir. 1993). If the government is successful in making this showing, then the Court must deny the habeas petition. But, where the petitioner's evidence demonstrates that his version of the facts is more likely to be true, or where "the evidence is evenly balanced," the Court must rule in favor of the petitioner. Dir., Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 281 (1994).

In weighing the evidence in this case, the Court is mindful of its obligation not to view each piece of evidence in isolation. Awad v. Obama, 608 F.3d 1, 7 (D.C. Cir. 2010). Thus, "[m]erely because a particular piece of evidence is insufficient, standing alone, to prove a particular point does not mean that the evidence may be tossed aside and the next piece of evidence may be evaluated as if the first did not exist." Salahi v. Obama, 625 F.3d 745, 753 (D.C. Cir. 2010). The Court, therefore, must view the government's evidence "in its entirety in determining whether [it] has satisfied its burden of proof." Id.

### III.    Legal Analysis

As noted above, the Court is tasked with determining whether the government has met its burden of proving by a preponderance of the evidence that the petitioner was a "part of" al-Qaeda or the Taliban at the time of his apprehension. At the merits hearing, the parties devoted substantial portions of their presentations to the question of whether the "Karim" identified by

11

~~SECRET~~

intelligence sources as a member of an al-Qaeda bomb cell was the petitioner in this case, Karim Bostan. Without delving into the specific arguments raised by counsel at the merits hearing, it is the Court's view that able counsel on both sides presented persuasive evidence on this issue. Despite the parties' efforts in this regard, the Court concludes that it need not decide the issue because, assuming the petitioner was not the "Karim" identified by intelligence sources in 2002, the petitioner is nonetheless detainable under the AUMF based on the following facts, all of which are admitted to by the petitioner: (1) that the petitioner was a member of the Jamaat al-Tablighi, Joint Stmt. at 12; (2) that the petitioner met Obaidullah and Wazir through the Jamaat al-Tablighi, Joint Stmt. at 12; (3) that immediately prior to his and the petitioner's capture by Pakistani authorities, Wazir was in possession of a broken cellular telephone, Pet'r's Exhibits, Ex. 507 (MFR March 23, 2003) at 6, and a large sum of cash while riding on a bus from Miram Shah to Peshawar; Joint Stmt. at 12; (4) that Wazir gave the telephone to the petitioner as he was exiting the bus to be searched by Pakistani authorities, Pet'r's Exhibits, Ex. 507 (MFR March 23, 2003) at 6; (5) that the petitioner attempted to hide the telephone upon receiving it from Wazir,[9]

---

[9] As the Court has previously explained at length in its prior decisions involving habeas corpus petitions filed by detainees currently imprisoned at the Guantanamo Bay Naval Base, statements contained in a "memorandum for record," or "MFR," contain hearsay, see Sulayman, 729 F. Supp. 2d at 35 (Walton, J.), and before the Court will accord any probative weight to such statements, the government has the burden of

> establish[ing] the reliability of those statements by making the following showing: (1) that with regards to the specific statements that the government seeks to rely upon, those statements "were made under circumstances that render them intrinsically reliable or were made by reliable sources"; (2) that "with respect to statements crucial to the government's case, that it would be unduly burdensome to call the sources as witnesses or provide declarations under oath in lieu of live testimony"; (3) "that the statements purportedly made by these sources were interpreted by a reliable interpreter," e.g., "an interpreter who works for the FBI or who has an ILR score of at least 3 in English," unless the statement being interpreted is one "that a person with an ILR score of 2+ would reasonably be able to understand and articulate in English"; and (4) "that the interpreted statements were recorded by the interrogator in a manner that is reliable," and that in cases involving statements crucial to the government's case, such a showing be made by the interrogator's live testimony, the submission of "a declaration or affidavit approximating such testimony," or, "as a last resort, . . . a global affidavit describing the process used by

(continued . . .)

12

~~SECRET~~

see id. at 6 (statement by the petitioner that Wazir "passed the phone to him . . . and that the [petitioner] hid the phone when it was passed to him"); and (6) Wazir's explanation to the Pakistani authorities that "he was carrying a broken phone" because "the phone could only be repaired in [Pakistan,] since no one" in Afghanistan could repair the device, id. As the Court explains below, these facts, when viewed collectively, demonstrate that the petitioner was more likely than not a "part of" al-Qaeda.

The District of Columbia Circuit's decision in Almerfedi provides the analytical framework that the Court must apply in this case. There, the Circuit was confronted with the question of whether the district court "fail[ed] to give sufficient weight to the reliable evidence it . . . consider[ed]" in that case, thereby erring in its "conclu[sion] that the government failed to demonstrate by a preponderance of the evidence that [the detainee] was . . . 'part of' al Qaeda." Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *1. The Circuit started its analysis by examining the significance of the detainee's association with the Jamaat al-Tablighi, "an Islamic missionary organization that is a Terrorist Support Entity 'closely aligned' with al Qaeda." Id. at ___, 2011 WL 2277607, at *4. Specifically, the detainee in that case acknowledged staying "for two[-]and[-]a[-]half months at Jama'at [al-]Tablighi" headquarters for free, but contends that "he refused to join the organization and remained largely incommunicado." Id. The Circuit

---

(. . . continued)
        interrogators," unless the government can show that it would be an undue burden to comply with this requirement.

Id. at 41-42. In regards to the March 23, 2003 Memorandum for Record, which is a record of the petitioner's first interrogation by government interrogators, see Hr'g Tr. at 366:23-24 (description by petitioner's counsel that Petitioner's Exhibit 507 is a record of "his first interrogation"), it is the petitioner, rather than the government, who seeks to rely on this hearsay evidence. See id. at 366:9-10 (description of the March 23, 2003 Memorandum for Record by petitioner's counsel as a "candid" record of the petitioner's "initial interview" with government interrogators); id. at 368:3-7 (representation by petitioner's counsel that his client provided complete and truthful answers to interrogator's questions). Presumably the government does not contest the reliability of any inculpatory statements contained in the document, and thus the Court will give substantial weight to the March 23, 2003 Memorandum for Record in rendering its decision in this case.

13

considered this evidence, in conjunction with two additional pieces of circumstantial evidence, as "damning." Id. at 5. Those other two items of circumstantial evidence were the detainee's travel route, which the Circuit found was "quite at odds with his professed desire to travel to Europe (and brought him closer to the Afghan border where al Qaeda was fighting), and also [the detainee's possession of] at least $2,000 of unexplained cash on his person when captured," id. at 4.

The Circuit concluded that Almerfedi's extended cost-free stay at the Jamaat al-Tablighi mosque was "probative, [although] by itself it presumably would not be sufficient to carry the government's burden because there are surely some persons associated with [the] Jama'at [al-]Tablighi who are not affiliated with al-Qaeda." Id. The Circuit found, however, that the government's case was on "firmer ground" when the evidence concerning Jamaat al-Tablighi was "add[ed]" together with the government's other two items of circumstantial evidence, id. at ___, 2011 WL 2277607, at *4, which the Court found "distinguish[ed]" Almerfedi "from the errant tourist, embedded journalist, or local aid worker," id. at ___, 2011 2277607, at *5. The Circuit "conclude[d] that all three facts, when considered together, [were] adequate to carry the government's burden of deploying credible evidence that the habeas petitioner meets the enemy-combatant criteria." Id. (internal citation omitted). Accordingly, the Circuit "conclude[d] as a matter of law that the district court erred" in the manner in which it applied the preponderance standard, and it reversed the district court's decision granting the petitioner's petition for a writ of habeas corpus. Id. at ___, 2011 WL 2277607, at *6 (emphasis added).

Following the Circuit's lead, this Court starts its analysis in this case with the petitioner's admission that he was a member of Jamaat al-Tablighi. Joint Stmt. at 12. While the Court acknowledges the Circuit's statement that there may be individuals associated with the Jamaat

14

al-Tablighi "who are not affiliated with al Qaeda,"[10] Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *4, here the petitioner admits that his relationships with Obaidullah and Wazir resulted from their "involvement" with the organization, Joint Stmt. at 12. This is not an insignificant fact; as the Court noted above, Obaidullah was found by Judge Leon of this Court to be, more likely than not, "a member of an al Qaeda bomb cell committed to the destruction of [United States] and Allied forces," Obaydullah, 774 F. Supp. 2d at 39, and, as discussed below, the undisputed facts raise the distinct possibility that Wazir was in possession of a detonation device, which he gave to the petitioner, see infra at 16. The Court, therefore, finds that the petitioner's involvement with the Jamaat al-Tablighi to be hardly innocuous.

Next, the Court must determine whether any "damning" circumstantial evidence exists that, when viewed together with the petitioner's membership in Jamaat al-Tablighi, is sufficient to support the lawfulness of the petitioner's detention by a preponderance of the evidence. And there is, based on the events leading up to the detention of Wazir and the petitioner by Pakistani authorities. As noted above, upon being directed by the Pakistani authorities to exit the bus, Wazir, who was possession of a substantial amount of money ($2,700 United States dollars, 3,600 Pakistani rupees, and $70,000 Afghan rupees), Joint Stmt. at 12, "handed" his broken cellular telephone to the petitioner "so that the security personnel would not take the phone," Pet'r's Exhibits, Ex. 507 (MFR Mar. 23, 2003) at 6. The Court has no reason to doubt that Wazir would be concerned about the Pakistani authorities confiscating his telephone; as the

---

[10] Although the petitioner attempts to neutralize the inculpatory nature of his membership in Jamaat al-Tablighi through the expert witness declaration from Professor Barbara Metcalf, see Pet'r's Exhibits, Ex. 388 (September 16, 2010 Declaration From Barbara Metcalf) ¶ 10 (concluding that "identification as a Tablighi should not ipse facto be grounds for suspecting an individual to be an enemy combatant"); Hr'g Tr. at 65:11-69:25 (reciting relevant portions of Metcalf's declaration), as discussed above, the Circuit made clear that an association with Jamaat al-Tablighi, along with other inculpatory facts, are sufficient to render the petitioner detainable as a matter of law, see supra at 12-13.

15

petitioner explained, the Pakistani authorities "would have passengers exit the bus, accuse them of being [affiliated with] al-Qaeda, and . . . take their personal belongings," and "security personnel [had] searched a couple of passengers" prior to directing Wazir to exit the bus. Id. But if the petitioner had no reason to believe that the telephone was anything other than an ordinary telephone, as the petitioner would have the Court believe, see Hr'g Tr. at 381:2-21 (argument by petitioner's counsel that Wazir's cellular telephone was "a standard device" and "not a terrorist device"), then the Court cannot fathom why Wazir was apparently more concerned about having his inoperable cellular telephone seized by the Pakistani authorities, as compared to a large sum of money, which he chose to retain in his possession. The only plausible explanation that can be derived from the record is the one offered by the government in a sworn declaration by a Department of Defense independent contractor—that cellular telephones are commonly used as switches to detonate improvised explosive devices. See Gov't's Exhibits, Ex. 22 (July 23, 2010 Declaration of[3] ▆▆▆▆▆) ¶ 7 (stating that "[m]any different systems can be used as switches [for improvised explosive devices], including wireless electronics. Cellular phones, cordless phones, custom-built radios, and car alarms are some common examples of consumer electronics that are modified for use in [improvised explosive devices]" by terrorist groups). With the government's declaration being the only credible evidence in the record to explain Wazir's transfer of his telephone to the petitioner, the Court finds that Wazir was more likely than not in possession of a device intended to be used in terrorist activity.

Yet, Wazir's possession of the telephone not only implicates him as part of al-Qaeda; it also inculpates the petitioner. The petitioner admitted that upon receiving the telephone from Wazir as Wazir was exiting the bus, the petitioner attempted (unsuccessfully) to hide the

16

telephone. See id. at 6. The fact that the petitioner attempted to conceal the telephone is "damning", Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *5, because if the petitioner had no knowledge of the cellular telephone's likely intended use as a detonating device, or why Wazir was transferring possession of the telephone to the petitioner, then it makes little sense to the Court that the petitioner would have attempted to hide the telephone from the Pakistani authorities. The most likely explanation underlying the petitioner's actions was his knowledge that the telephone could be used to detonate explosive devices. Thus, the petitioner's possession of the cellular telephone, along with his attempt to conceal the telephone after receiving it from Wazir, undoubtedly weighs heavily in favor of a finding that the petitioner is detainable under the AUMF. Cf. Al-Adahi v. Obama, 613 F.3d 1102, 1109 (D.C. Cir. 2010) (according probative value to the government's evidence that a detainee possessed the "model of Casio watch the military has linked to al-Qaida and terrorist activity").

For the reasons discussed above, the Court is compelled to conclude that the undisputed facts in this case, when viewed as a whole, are sufficient to render the petitioner detainable under the AUMF. As the Circuit found in Almerfedi, a detainee's membership in Jamaat al-Tablighi, together with other "damning" circumstantial evidence, is sufficient as a matter of law to justify the detainee's detention. See Almerfedi, ___ F.3d at ___, 2011 WL 2277607, at *5. Here, there is no dispute that the petitioner was a member of that organization. Furthermore, when the petitioner's involvement with Jamaat al-Tablighi is viewed together with the most plausible inferences to be drawn from Wazir's and the petitioner's attempt to conceal an inoperable cellular telephone from Pakistani authorities, this circumstantial evidence is indeed "damning." To be sure, it is perhaps possible that an innocent reason, or several innocent reasons, might explain the petitioner's involvement with a Terrorist Support Entity, his unexplained chance

encounter with an acquaintance from that organization at a bus stop, the other individual's possession of a large sum of money and an inoperable cellular telephone, that individual's decision to give possession of the telephone to the petitioner rather than his money to avoid its seizure by government security officials, and the petitioner's decision to conceal the telephone. But, "the far more likely explanation for [this] plethora of damning circumstantial evidence is that [the petitioner] was part of al Qaeda." Uthman v. Obama, 637 F.3d 400, 407 (D.C. Cir. 2011). Accordingly, the Court finds that the weight of the evidence in the record supports the petitioner's detention under the AUMF.

## IV. Conclusion

"Once the government has established by a preponderance of the evidence that [the petitioner] was 'part of' al Qaeda . . . , the requirements of the AUMF are satisfied and the government has the authority to detain [the petitioner]." Id. at ___, 2010 WL 2679752, at *9. The government has provided more than sufficient evidence—all of it in the form of the petitioner's own admissions—to satisfy its burden of establishing the lawfulness of the petitioner's detention as a matter of law. Moreover, the petitioner has failed to rebut the government's evidence with more persuasive evidence. Accordingly, the petitioner's petition for a writ of habeas corpus must be denied.

**SO ORDERED** this 12th day of October, 2011.[11]

REGGIE B. WALTON
United States District Judge

---

[11] An Order will accompany this Memorandum Opinion denying the petitioner's petition for a writ of habeas corpus.

18